214 N.J. Super. 686 (1986)
520 A.2d 852
HAROLD PESKIN, MILTON PESKIN AND NORMAN PESKIN, PLAINTIFFS,
v.
LIBERTY MUTUAL INSURANCE COMPANY, DEFENDANT.
Superior Court of New Jersey, Law Division Essex County.
Decided October 15, 1986.
*688 Dennis J. Alessi for plaintiffs (Fox & Fox, attorneys).
Frank R. Cinquina for defendant (Schwartz & Andolino, attorneys).
VILLANUEVA, J.S.C.
This is a lawsuit by insureds against their excess liability carrier, after they paid an injured infant's claim. The insurance company moves for summary judgment to dismiss the complaint because it was prejudiced by receiving notice of the underlying accident 11 years late.
The issue is whether the court must grant summary judgment to the insurer when there is a genuine issue as to a material fact, coverage, because the insurance company has been deprived of the ability to locate any of its files to determine coverage due to the insureds' failure to give notice for 11 years.
*689 The court holds that since no one now has copies of the insurance policies because the insureds failed to comply with the notice provision of the policies, the insurance company was prejudiced as it cannot now dispute by its records the insureds' allegations as to coverage  both as to the "business activity" exclusion and the amount of the retention by the insureds before there could be liability for excess coverage.

Statement of Facts.
This is an action brought by Harold Peskin, Milton Peskin and Norman Peskin against Liberty Mutual Insurance Company upon policies of umbrella liability insurance known as "personal catastrophe liability policies," issued respectively to Harold, Milton and Norman Peskin (hereinafter "Peskins") by Liberty Mutual Insurance Company (hereinafter "Liberty Mutual").
On February 12, 1972, a fire occurred at an apartment building at 17-19 Seabury Street, Newark, which completely destroyed the building. The property was owned by a real estate partnership, consisting of the Peskins, which was primarily involved with the rental of six-family houses and other multi-family dwellings.
On July 12, 1981, Frances and Jean Wilcher, as guardians ad litem for Robert Wilcher, an infant, filed a complaint against the Peskins, seeking damages for personal injuries allegedly resulting from the fire. The Wilchers were allowed to bring this suit pursuant to N.J.S.A. 2A:14-21, which tolls the statute of limitations for persons injured during infancy, even though the law suit was filed 9 1/2 years after the fire.
The Wilcher suit was settled on June 13, 1983, for $250,000. Peskins' underlying insurer, Progressive Casualty Insurance Company, paid $100,000 to the Wilchers, and the Peskins paid *690 the remaining $150,000. This suit seeks to recover from Liberty Mutual the $150,000 that the Peskins paid.[*]
Milton Peskin testified on deposition that, at the time of the fire, a liability insurance policy of $100,000/$300,000 was in effect on the Seabury Street property, issued by Progressive Casualty Insurance Company, effective from March 16, 1970, issued through the Frankel Eisenberg Agency. He learned of the fire the day after it occurred, visited the site and was aware that one person was killed in the fire and six others, including two children, were seriously injured. Thirty persons were left homeless as a result of the fire. Within one week after the fire, he notified the Frankel Eisenberg Agency, through which the primary liability policy had been issued, and the Slapin-Lieb Agency, which had issued the fire insurance policy on the building. Either the Peskins or the agent contacted Progressive, but they did not contact Liberty Mutual after the fire. However, it was Milton's belief and contention that the liability coverage afforded on the Seabury Street property was $100,000/$300,000 with Progressive, plus three $1,000,000 umbrella policies issued by Liberty Mutual.
Because Milton did not recall the existence of the umbrella policies when the Wilcher action was brought, it was not until April 1983 that he contacted his company's accountant, Eugene Feldman, to ask him to search his files to determine whether there was any additional insurance on the Seabury Street property which might cover any claims resulting from the Wilcher suit. Feldman found cancelled premium checks written to Liberty Mutual ($61.97 paid by each brother) and other records which indicated that umbrella policies issued to the Peskins by Liberty Mutual were in effect when the fire occurred.
*691 Upon receipt of this information the Peskins, for the first time, notified Liberty Mutual by letter dated April 23, 1983 that, due to a fire at the Seabury Street property, a claim had arisen under the umbrella policies. This letter also notified Liberty Mutual that the Wilchers had filed suit against the Peskins almost two years earlier. Liberty Mutual immediately disclaimed liability for claims that arose from the fire.
Milton Peskin testified that he and his brother, Norman handled the insurance coverage for their different properties.
George Sudzina has been the assistant underwriting manager for Liberty Mutual since 1977. He deals strictly with personal lines insurance. When he received the telephone call from Liberty Mutual's claims department with the policy numbers set forth in the letter from the Peskins' attorney dated April 23, 1983, he went to the Liberty Mutual Policy register and determined that the policies in question were personal catastrophe policies issued to the Peskins and their wives. He tried to locate the underwriting files for these policies but was unable to do so.
Sudzina explained that in 1974 Liberty Mutual began microfilming their paper files for insurance policies that were in force. As the subject policies had previously expired and were not in force, they were not microfilmed. Normally, Liberty Mutual kept expired policies for two or three years in file cabinets after making sure that they were not in force, after which time they would have been destroyed. All three personal catastrophe policies of the Peskins expired on May 10, 1972, and were not renewed thereafter. Thus, when Liberty Mutual received the Peskins' claim in April 1983, they could not locate the policies, declaration sheets or endorsements. The personal catastrophe liability policy jacket that would have been issued for the period in which coverage was asserted by plaintiffs was submitted with this motion. However, the policy jacket would not include whatever declaration sheets or endorsements which would have been part of the original policies.
*692 Robert Heissler, a Liberty Mutual salesman, testified at his deposition that in the spring of 1969, he met Milton Peskin, who inquired about Liberty Mutual automobile insurance. After discussing automobile insurance with Milton, he discussed homeowner's coverage with him as well. Subsequently, Milton called him and asked about umbrella coverage. After Heissler explained the policy to him over the telephone, he went to the S. Peskin store to write the personal catastrophe coverage, as well as homeowner's coverage, for Milton. He also discussed that insurance with Norman and Harold.
The applications from 1969 are no longer available. Among the information which would have been contained in those applications were the underlying policies, their policy numbers and the limits of liability of those underlying policies. Heissler explained to all three Peskins that the personal catastrophe policies would not cover their business pursuits.
On deposition, Milton Peskin insisted that the policies that they purchased from Liberty Mutual were business policies, and not personal policies. He also stated that in their conversations with the Liberty Mutual salesman they discussed their needs for insurance to adequately cover them for excess liability with respect to property owned by the real estate partnership and by S. Peskin & Company. Norman Peskin was not even certain of the Liberty Mutual representative with whom he dealt at the time the personal catastrophe policies were issued. He stated that he thought he dealt with Vincent Colvin, as he had taken out automobile insurance through Colvin, but he was not sure if he had dealt with Colvin prior to that time. He said he told Colvin their requirements and advised him that they wanted to cover their business activities.
Plaintiffs oppose defendant's motion for summary judgment on the ground that they substantially complied with the notice provision of the policies and both parties were equally prejudiced by the lapse of time between the fire and the Wilcher claim.

*693 Standard Provisions of Personal Catastrophe Liability Policies in 1972.

The jacket for the personal catastrophe policy states, in pertinent part:
This policy does not apply:
....
(c) to personal injury or property damage arising out of business pursuits or business property, except with respect to such coverage therefor as is afforded to the insured under any underlying policy....
It further states:
The company will pay on behalf of the insured all sums in excess of the retained limit which the insured shall become legally obligated to pay as damages....
The words "retained limit" and "underlying policy" are defined as follows:
"retained limit" means as to each occurrence with respect to which insurance is afforded under this policy the sum of (1) all amounts payable under an applicable underlying policy, if any, or which would be payable under such a policy but for breach of policy conditions, and (2) all amounts payable under any other valid and collectible insurance available to the insured, or which would be payable under such a policy in the absence of this policy, but in no event shall the retained limit be less than the amount stated in the declarations as the insured's retention;
"underlying policy", "underlying insurer" mean, respectively, a policy listed as an underlying policy in the declarations and the insurer or insurers subscribing such a policy;
The policy further states:
Liability under this policy with respect to any occurrence shall not attach unless and until the insured, or the insured's underlying insurers, shall have paid the amount of the retained limit on account of such occurrence.
The subject policy also contains a provision requiring notice of an occurrence:
"Notice of Occurrence". Whenever the insured has information from which he may reasonably conclude that an occurrence has taken place which might involve this policy, notice shall be sent to the company or any of its authorized agents as soon as practicable.

Liberty Mutual's Claim of Prejudice.
Liberty Mutual's contention is that plaintiffs' delay of over 11 years in notifying Liberty Mutual of the potential claim has *694 severely prejudiced it in the defense of this action, as its records of the policy, including the applications, endorsements and declaration sheets, have been discarded with the passage of time.
Peskins contend that the notice provision is ambiguous and therefore it should be construed in light of the unique factual setting of the instant case. They further contend that a jury must assess the reasonableness of their action because (1) they gave their underlying insurer immediate notice of the fire; and (2) since no claims had been made against them, they had no reason to believe that they would require additional coverage under their umbrella policies with Liberty Mutual.
The objectively reasonable expectations of the insured will be honored when determining entitlement to coverage. Bryan Constr. Co. Inc. v. Employers' Surplus Lines Ins. Co., 60 N.J. 375, 378 (1972). An insured will not lose his coverage if he believed in good faith that he would not be subject to a claim and therefore did not notify the insurer of the subject incident. To prove the breach of the notice provision of the policy, the insurer must establish not only a breach by the insured but also the likelihood of appreciable prejudice. Cooper v. Government Employees Ins. Co., 51 N.J. 86, 90 (1968).
Policies are to be strictly construed against the insurer. Allen v. Metropolitan Life Ins. Co., 44 N.J. 294, 305 (1965); Meier v. New Jersey Life Ins. Co., 195 N.J. Super. 478, 487 (App.Div. 1984). However, insurance companies do have rights too. Compliance by the insured with notice provisions is one such right.
The purpose of a notice of loss provision is to allow the insurer an opportunity to commence investigation and to protect its interests. Nat'l Newark & Essex Bank v. American Insurance Company, 76 N.J. 64, 82 (1978).
The phrase "as soon as practicable" has uniformly been construed to mean "within a reasonable time." The question as to what is a reasonable time depends on the facts and circumstances *695 of the particular case, and it is a question of fact for resolution by the jury or fact-finder, unless the basic facts are undisputed and only one inference can reasonably be drawn therefrom. Figueroa v. Puter, 84 N.J. Super. 349, 354 (App. Div. 1964).
In Cooper, supra, the Court found that the notice provision was not breached, but the facts were much different. There, the automobile accident was minor and the insured and the injured party, who were friends, saw each other a number of times after the accident, and at no time thereafter did the injured party refer to an injury or indicate that a claim would be made against the insured. The injured party was surprised to learn that her attorney had sued Cooper, the insured. The Court referred to the incident as a "trivial or inconsequential event." However, the Court stated that an insured may not omit to report an accident upon the basis of his own opinion that he was not at fault or that the claimed injuries were not real, and that, therefore, the claim was without merit:
This does not mean that an insured, conscious of a possibility of a claim, may omit to report the accident upon the ground that in his opinion the claim is without merit either because the fault was not his or because the claimed injuries are unreal. Obviously an insured may not assume the role of judge and jury. But the insured does not lose the agreed policy protection if he omits to give notice because he reasonably and in good faith believes no claim against him is contemplated either because the damage is trivial or because there is no suggestion in the circumstances that he is causally involved. This accords with the reasonable expectation of the parties to the insurance arrangement. [51 N.J. at 90]
Both Milton and Norman Peskin knew shortly after the fire that one person had died and several people had been seriously injured in a fire in their building. There is no question that, based upon these facts, plaintiffs had more than enough information to put them on notice that Liberty Mutual should have been notified of the fire. In fact, they did notify Progressive Casualty Insurance Company, which had the primary liability coverage on the premises.
The Peskins are not illiterate, unsophisticated people who might not be aware of the niceties of such procedures. Milton *696 had a degree in business administration from Rutgers University, with a major in accounting. They not only owned their own retail business but owned a number of apartment buildings, both through the real estate partnership, which owned the subject building, and through a corporation, Westmark Corporation.
Therefore, the court can consider their background and experience. See Figueroa v. Puter, supra, in which the court stated:
In deciding whether the insured has acted as a reasonable person would in relation to the time when notice was given, the court should take into consideration the "particular background, intelligence and experience" of this particular insured.... This is because the standard of conduct to be applied involves some knowledge of or assumptions as to the law of liability by the insured and some judgment on her part respecting application of the law to the known facts. "This is not an area for application of standards applicable to the ordinary `reasonable man,' within the general tort viewpoint." [84 N.J. Super. at 355]
There can be no valid dispute that the notice provision of the policies was breached by the insureds, under the circumstances of this case, as a matter of law.
With regard to the issue of prejudice, plaintiffs contend that the policies in question were business policies, whereas both Heissler and the Liberty Mutual records indicate that the policies were "personal catastrophe" policies. Thus, basic disagreements over the coverage are reduced to issues of credibility; had prompt notice been given to Liberty Mutual by plaintiffs, such dispute would not have occurred. The standard policy contained an exclusion for "personal injury or property damage arising out of business pursuits or business property, except with respect to such coverage therefor as is afforded to the insured under any underlying policy." The underlying policy is defined as "a policy listed as an underlying policy in the declarations." Liberty Mutual contends that there was no underlying policy listed in the declarations, as Heissler was a personal lines salesman and would not have sold coverage for business pursuits or business property. He also testified that he specifically explained to the Peskins that the policies in *697 question would not afford coverage for their business. Therefore, had the declaration sheet still been available, it would not have indicated any underlying policy issued by Progressive or any other insurer for these premises. However, that declaration sheet is no longer available. As Sudzina testified, the subject policies expired May 10, 1972, and in 1974 Liberty Mutual microfilmed all policies which were in force at the time. As the subject policies were not renewed in 1974, and since plaintiffs never bothered to contact Liberty Mutual and put them on notice that a fire had occurred during the policy period, there was absolutely no way that Liberty Mutual could know that these policies would have to remain on file for 11 years.
The essence of this action is the precise terms of the insurance contracts, including such vital information as the retained limits, the underlying insurers, the underlying policies, the limits of those underlying policies and other information which would permit Liberty Mutual to reinforce its position concerning coverage, which is no longer available to Liberty Mutual because of plaintiffs' delay in notifying it of the incident in question.
The standard policy also specifies that liability under the policy would not attach until and unless the insured or the insured's underlying insurers paid the amount of the retained limit.
Thus, even if coverage had been afforded under the policy, there would only be coverage over and above the retained limit. To determine the retained limit, one must have access to the underlying policies, their limits of liability and the declaration sheets, which would state the insureds' retention.
The underlying policies would have been listed on the declarations. They would have stated that the insured's retention was also stated on the declaration sheet. Robert Heissler testified that not only the underlying policies, but also their limits of liability, would have been shown on the insurance applications.
*698 By reason of plaintiffs' breach of the notice provision of the policies, neither the declaration sheets nor the applications are available. Had prompt notification been given to Liberty Mutual by plaintiffs, all of those documents would have been available to Liberty Mutual, but they have since been destroyed because plaintiffs waited until more than 11 years after the fire occurred to notify Liberty Mutual of its occurrence.
What plaintiffs have done by failing to give timely notice to Liberty Mutual is to put it in a position that it has to argue fact questions as to the policy provisions while plaintiffs have deprived it of the opportunity to adequately defend the coverage issue.
The insurer must establish more than the mere fact that it cannot employ its normal procedures in investigating and evaluating the claim. Rather, it must show that substantial rights pertaining to a defense against the claim have been irretrievably lost. Morales v. National Grange Mut. Ins. Co., 176 N.J. Super. 347, 355 (Law Div. 1980). The court will consider whether the delay in giving proper notice has had an adverse effect on the likelihood of success by the insurance company in defending itself against the claim. Id. at 356.
The failure of plaintiffs to report the fire promptly to Liberty Mutual, when both Milton and Norman Peskin were aware of a death and several serious injuries within days after the occurrence of the fire, has prejudiced Liberty Mutual in its defense of this action, as valuable information concerning the policies has been irretrievably lost. Accordingly, plaintiffs have breached the notice provision of the policies as a matter of law, and such breach has prejudiced Liberty Mutual in the defense of this action.
In a similar type of situation the Appellate Division held that a clear demonstration of prejudice to defendant's rights required dismissal of the action due to the fact that the summons was not issued within ten days after filing of the complaint. Moschou v. DeRosa, 192 N.J. Super. 463 (App.Div. 1984). In *699 that case the complaint was filed 37 days prior to the expiration of the six-year statute of limitations. The summons, however, was not issued until 78 days after the complaint was filed. Defendant was served with the summons and complaint ten days thereafter. Defendant's attorney certified that after the statute of limitations expired, defendant disposed of his books and records pertaining to the transaction. The court, therefore, held that the delay in issuing the summons until after the expiration of the six-year period of limitations prejudiced defendant's substantial rights. Id. at 467.

Entire Controversy Doctrine Not a Defense.
Liberty Mutual also contends that this action should be dismissed based upon the entire controversy doctrine, because plaintiffs' claims against their real estate manager and insurance agent and Liberty Mutual should have been asserted in one action, as they both related to the issue of insurance coverage for the subject incident.
Peskins commenced a separate action on July 26, 1983 against Raymond Saks, their real estate manager, alleging that Saks negligently failed to advise them concerning insurance coverage on the Seabury Street property, and, that as a result of his negligence, they were obligated to pay personally $150,000 of the $250,000 settlement of the infant's personal injury claims arising from the 1972 fire. They subsequently amended the complaint to add Frankel Eisenberg Insurance Agency and Frankel Insurance Agency as defendants (after they had been initially brought into the case by Saks as third-party defendants), also alleging that they were negligent in not obtaining higher limits of insurance coverage for the Peskins. In April 1986, that case was settled. This action had been commenced against Liberty Mutual on August 16, 1984. The allegation in this case is that Liberty Mutual afforded coverage over and above the $100,000 limit of the Progressive policy, under three one-million dollar personal umbrella excess policies issued respectively, to Norman, Harold and Milton Peskin. Plaintiffs *700 never sought to consolidate this action with the action they brought against Saks and Frankel, nor did they ever attempt to amend this complaint to add Saks and Frankel as defendants. Neither did Liberty Mutual move to consolidate the two cases.
New Jersey Court rules state:
4:5-1. Pleadings Allowed; Notice of Other Actions
There shall be a complaint and an answer; an answer to a counterclaim denominated as such; an answer to a cross-claim, if the answer contains a cross-claim; a third-party complaint pursuant to R. 4:8; a third-party answer, if a third-party complaint is served; and a reply, if an affirmative defense is set forth in an answer and the pleader wishes to allege any matter constituting an avoidance of the defense. No other pleading is allowed. Each party shall include with the first pleading a certification as to whether the matter in controversy is the subject of any other action pending in any court or of a pending arbitration proceeding, or whether any other action or arbitration proceeding is contemplated; and, if so, the certification shall identify such actions and all parties thereto. Further, each party shall disclose in the certification the names of any other party who should be joined in the action. Each party shall have a continuing obligation during the course of the litigation to file and serve on all other parties and with the court an amended certification if there is a change in the facts stated in the original certification. The court may compel the joinder of parties in appropriate circumstances, either upon its own motion or that of a party. [Italics became effective September 10, 1984]
....
4:27-1. Joinder of Claims
(a) Permissive Joinder. The plaintiff in his complaint or in an answer to a counterclaim denominated as such and the defendant in an answer setting forth a counterclaim may join either as independent or as alternate claims as many claims, either legal or equitable or both, as he may have against an opposing party. There may be a like joinder of claims when there are multiple parties if the requirements of R.4:28 (joinder of parties), R.4:29 (joinder of multiple parties), and R.4:31 (interpleader) are satisfied.
....
(b) Mandatory Joinder. Each party to an action shall assert therein all claims which he may have against any other party thereto insofar as may be required by application of the entire controversy doctrine.
Liberty Mutual contends that plaintiffs' failure to join the claims against Saks and Frankel with the claim against Liberty *701 Mutual in one action is violative of the entire controversy doctrine.
A component of the controversy may not be unfairly withheld, and, if it is, the subsequent action must be dismissed. To judge whether application of the doctrine is appropriate, the court will determine whether omission of the subject claim will result in the same parties engaging in a second action to resolve claims not disposed of in the first action. Wm. Blanchard Co. v. Beach Concrete Co., Inc., 150 N.J. Super. 277, 293-294 (App.Div. 1977). There the court held that the entire controversy doctrine would apply whether or not the omitted component constituted either an independent cause of action by technical common-law definition or an independent claim which, in the abstract, was separately adjudicable. Id. at 294.
In The Malaker Corp. v. First Jersey National Bank, 163 N.J. Super. 463, 497 (App.Div. 1978), the court indicated when the entire controversy doctrine is applicable:
The essential inquiry is whether the claims here asserted derive from a single transaction or a series of related transactions, a portion of which was disposed of by final judgment in the earlier lawsuit. If they have such derivation, they are barred.
While there was no final judgment in the earlier lawsuit, there was a settlement completely disposing of the claims of the Peskins against Saks and Frankel.
Until 1984, it was firmly established that the essence of the entire controversy doctrine was the joinder of claims, not parties. Aetna Ins. Co. v. Gilchrist Brothers, Inc., 85 N.J. 550, 558 (1981). Therefore, the doctrine was never extended to require that all possible parties be joined but only that all claims be raised in one action. Ibid. See also McFadden v. Turner, 159 N.J. Super. 360, 370 (App.Div. 1978). The reason for this limitation was that the courts did not wish to prevent plaintiffs from obtaining complete relief or to keep non-parties from asserting their claims or defenses because they were not joined in the original action. McFadden at 372; Aetna, 85 N.J. at 558.
*702 By the rule amendment in September 1984, the Supreme Court narrowly expanded the entire controversy doctrine to require joinder of parties under limited circumstances. R. 4:5-1. Crispin v. Volkswagenwerk, A.F., 96 N.J. 336, 343 (1984). Chiacchio v. Chiacchio, 198 N.J. Super. 1, 8 (App.Div. 1984).
Liberty Mutual contends that modification of the entire controversy doctrine to include joinder of parties as well as claims was codified in R. 4:5-1. However, the rule does not address joinder requirements as such; it is primarily a notice provision. The comment to the rule states:
The intent of this rule is to provide notice to all parties in each action that there are other actions pending involving the same controversy. As a result of such notice, all parties can move to intervene in other pending actions, to consolidate other pending actions, or to take whatever other steps that may be appropriate to protect their respective interests. See generally Crispin v. Volkswagenwerk, A.G., 96 N.J. 336 (1984), decided just prior to the adoption of the 1984 amendment, illustrative of its purpose, and indicative of its motivation. [Pressler, Current N.J. Court Rules, Comment R 4:5-2 (1987)]
The comment speaks in terms of other actions "involving the same controversy." This litigation involves a different controversy. The legal and factual issues in this action are different from those in Saks and Frankel. The legal issue unique to the present litigation is a disclaimer of insurance coverage, and the distinctive factual issues are the contacts and understandings between Milton Peskin, primarily, and the agent of Liberty Mutual, which issues are distinct from the claims of negligent management in Saks and Frankel.
There is no doubt that the incident which gave rise to both actions was the same, that is, the fire of February 12, 1972. The basis for both actions was the fact that the claims asserted by Frances Wilcher exceeded the $100,000 primary coverage afforded to the Peskins by Progressive. The gravamen of both suits was the seeking of a means by which plaintiffs could be reimbursed for the amount paid by them in excess of the limits of the Progressive policy. In this action, plaintiffs seek recovery against Liberty Mutual based upon alleged excess policies of one million dollars over and above the Progressive policy. *703 The claims arose out of the incident but the transactions complained of were different.
In Crispin v. Volkswagenwerk, A.G., supra, plaintiff brought a personal injury action in Union County against the operators of various vehicles involved in a multi-car accident, the Department of Transportation, which maintained the section of the Garden State Parkway on which the accident occurred and S.J. Groves & Sons Company, the construction contractor on the site. Subsequently, after learning of a possible defect in the Volkswagen automobile operated by his client by means of a television show which he watched, counsel for plaintiff commenced a second action in the Superior Court, Bergen County. He did not advise the parties in the Union County action of the Bergen County suit against Volkswagen and, in fact, opposed the motion of the Department of Transportation to join Volkswagen as a third-party defendant. Subsequently, the Union County action was settled.
The Supreme Court stated that the time had come to reconsider the application of the entire controversy doctrine to parties as well as claims. The Court held that where a litigant knows of a potentially responsible party and has already sued that party in another action, the principles that underlay the entire controversy doctrine should come into play, and the party should not be permitted to maintain such independent action when a directly-related suit is pending:
In Aetna, supra, we fell short of such an extension, preferring instead to refer the matter to our Civil Practice Committee, 85 N.J. at 560 & n. 3. In 1982 that Committee recommended that the entire controversy doctrine not be extended to parties because, in its view, new mandatory joinder rules would only intensify the already complex, time-consuming, and expensive nature of modern litigation. But the complex webs of causation that arise in cases of this nature suggest that joinder of known responsible parties in a single action be the norm. Certainly where, as here, a litigant knows of a potentially responsible party, and has already sued that party in another action, the principles that underlay the entire controversy doctrine should come into play. A party should not be permitted to maintain such independent action when a directly related suit is pending. [Id. at 343]
*704 In that case, the suit against the other drivers, the Department of Transportation and the construction company was for negligence in causing the accident itself. The claim against Volkswagen was only for the enhancement of the injury caused by a defective design of the automobile. Id. at 346.
The Court held in Crispin, supra that the rule would not be applied retroactively. All litigation in that case was completed by 1982, and the rules had not been amended at that time. Here, the suit against Saks was pending between July 1983 and April 1986, when it was settled, while the present action was commenced in August 1984.
In addition, during discovery in this case, Liberty Mutual learned of the Peskins' suit against Saks. However, it was not until this motion was filed on the eve of trial that it first objected to plaintiffs' alleged failure to join Liberty Mutual as a third-party defendant or a direct defendant in the Saks' case or to have the cases consolidated.
Such failure estops Liberty Mutual from now asserting this defense. Liberty Mutual's answer listed 12 affirmative defenses without setting forth the affirmative defense of the entire controversy doctrine, as required by R. 4:5-4.
Even a public entity may be estopped from asserting a separate defense (such as notice requirements) when it fails to assert such a defense until it is too late for the plaintiff to satisfy a legal requirement. Hill v. Middletown Bd. of Ed., 183 N.J. Super. 36 (App.Div. 1982), certif. den. 91 N.J. 233 (1982); Anske v. Borough of Palisades Park, 139 N.J. Super. 342 (App.Div. 1976).
The court believes that the two cases are interwoven and could have been joined. It can easily be seen that defendants in both actions may have acted differently had there been a joinder and also could have sought contribution. Had Liberty Mutual not learned of the Saks lawsuit and settlement, it would *705 never have realized that Peskins' loss was not $150,000, as alleged.
Since R. 4:5-1 was amended to be effective September 10, 1984, it cannot be applied retroactively. Crispin v. Volkswagenwerk, A.G., supra, 96 N.J. at 343.
Therefore, the entire controversy doctrine is not a defense to this action.

Conclusion.
Motion for summary judgment to dismiss the complaint is granted.
NOTES
[*] At oral argument, counsel for the Peskins acknowledged that Liberty Mutual was entitled to a credit of $25,000 received by the Peskins from litigation against Raymond Saks, their real estate manager, which matter is discussed later regarding the entire controversy doctrine.