**BRITISH INSURANCE COMPANY OF CAYMAN, Plaintiff,**

v.

**SAFETY NATIONAL CASUALTY CORPORATION, Defendant.**

**No. CIV. 99–3343(WGB).**

United States District Court, D. New Jersey.

June 1, 2001.

Shawn L. Kelly, Thomas J. Perry, Andrea J. Giannetta, Riker, Danzig, Scherer, Hyland & Perretti LLP, Morristown, NJ, for Plaintiff British Insurance Company of Cayman.

John C. Sullivan, Post & Schell, P.C., Voorhees, NJ, for Defendant Safety National Casualty Corporation.

## OPINION

BASSLER, District Judge:

At issue in this litigation is whether an insurance company failed to give timely notice of an underlying claim to its reinsurer and if so, whether the reinsurer must show that it suffered prejudice as a result of such late notice in order to escape its contractual indemnification obligation under the reinsurance policy.

Plaintiff British Insurance Company of Cayman ("BICC") is the insurance company seeking recovery of reinsurance balances against its reinsurer, Safety National Casualty Corporation ("Safety"). BICC maintains that its predecessor-in-interest gave Safety notice of the underlying claim in 1994, which was nine years after initially learning of that claim. BICC claims that such notice was timely because the obligation to provide notice did not arise until that time. Moreover, it claims that even if notice was untimely, it should prevail on its motion for summary judgment because Safety was not prejudiced by any delay.

Safety does not dispute that the contract for reinsurance applies to the losses at issue; rather, Safety has filed a cross motion for summary judgment contending that it is not obligated to indemnify BICC because BICC's predecessor failed to provide timely notice of the underlying claim. According to Safety, even if it was notified of the underlying claim in 1994, which it disputes, a nine year lapse is untimely as a matter of law. Alternatively, Safety contends that at the latest, BICC's obligation to provide notice arose in 1992 and that the resulting two year delay is also untimely.

The Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.[1] Oral argument was heard on May 7, 2001. For the reasons set forth below, BICC's motion for summary judgment is **denied.** Safety's cross motion for summary judgment is **granted.**

## I.  *Insurance and Reinsurance Policies*

American Centennial Insurance Company ("ACIC"), BICC's predecessor-in-interest, issued May Department Stores ("May") an insurance policy that provided excess workers' compensation and employer liability coverage (the "Policy") from February 1, 1982 to February 1, 1983. The Policy provided $10,000,000 in work-

---

1.  BICC is a corporation organized and existing under the laws of the Cayman Islands, with its principal place of business in Grand Cayman, BWI. (Compl., ¶ 1.) Safety is a corporation organized and existing under the laws of Missouri, with its principal place of business in Missouri. (*Id.* at ¶ 2.)

ers' compensation coverage in excess of a $250,000 self-insured retention. The self-insured retention required May to pay the first $250,000 before ACIC would have any obligation to pay under the Policy.

ACIC transferred, or ceded, risk to Safety under the Policy by buying reinsurance from Safety in the form of a Certificate of Facultative Reinsurance ("Facultative Reinsurance"). Pursuant to the Facultative Reinsurance, Safety received premium ceded by ACIC and undertook to reimburse ACIC's losses up to a specified limit. Specifically, under the Facultative Reinsurance, Safety is to reimburse ACIC for any losses in excess of the $250,000 self-insured retention up to $750,000, and for any losses in excess of $5,250,000 up to $5,000,000.

The Facultative Reinsurance contains a notice provision, which states:

> The Company shall advise the Reinsurer promptly of any claim and any subsequent developments pertaining thereto which, in the opinion of the Company, may involve the reinsurance hereunder. . . . The Company, when so requested, will afford the Reinsurer an opportunity to be associated with the Company, at the expense of the Reinsurer, in the defense or control of any claim, suit or proceeding involving this reinsurance, and the Company and the Reinsurer shall cooperate in every respect in the defense and control of such claim, suit or proceeding.

(Paragraph 4 of Certificate of Facultative Reinsurance attached to Certification of Thomas Perry, Esq. ("Perry Cert.") as Ex. A.)

Pursuant to an Assumption Reinsurance Agreement dated August 29, 1996, ACIC assigned the Facultative Reinsurance to British International Insurance Company ("British International"). Then pursuant to an Assumption Reinsurance Agreement dated November 30, 1998, BICC assumed the Facultative Reinsurance.

## II. Kirtos Worker's Compensation Claim

Anthony Kirtos ("Kirtos") was employed by May as a truck driver. On March 18, 1982, Kirtos sustained a back and neck strain while carrying a sofa. He subsequently filed a workers' compensation claim against May. As of December 31, 2000, BICC's losses on the Kirtos claim totaled $62,172.61. Continuing to make payments to May as it is obligated to do, BICC has determined that its overall exposure on this claim, exclusive of what it has paid to date, is at least $197,823.79, based on Kirtos' life expectancy and the present value of his benefits.

The Kirtos claim has been managed by Central Regional Claims Corporation ("CRCC"), the claims handling entity for May. Among other things, CRCC (1) obtained surveillance reports and independent medical examinations of the claimant; (2) paid the claimant's medical bills; (3) reviewed the claimant's medical reports and decisions of the Bureau of Workers' Compensation and Industrial Commission of Ohio regarding the claimant; and (3) coordinated the defense of the Kirtos claim, which BICC alleges included efforts at settlement.

## III. Notices to ACIC

### A. First Notice to ACIC

By letter dated March 15, 1985, CRCC reported the Kirtos claim to May's insurance broker, Marsh & McLennan ("Marsh"). Marsh notified ACIC of the Kirtos claim by letter dated April 9, 1985. (March 15, 1985 letter attached to Certification of John C. Sullivan, Esq. ("Sullivan Cert.") as Ex. B.) In that letter, CRCC stated that its submission of the claim "[did] not 'necessarily indicate a belief that

the excess coverage will be involved, but is rather, an interpretation of the carriers' wishes to be notified." (*Id.*)

The Claims Summary Report, which was included in the materials provided to ACIC, advised ACIC that as of August 15, 1984, Kirtos was receiving temporary and total disability benefits ("TTD"). It was estimated that the TTD benefits would continue for 127 weeks. (Claims Summary Report attached to Sullivan Cert. as Ex. B.)

On April 24, 1985, after receiving notice of the Kirtos claim, ACIC opened a claims file. ACIC closed the file on that same day, or shortly thereafter, upon determining that the claim "won't reach ACIC layer." (Worksheet attached to Sullivan Cert. as Ex. B.)

There is no dispute that ACIC did not provide notice to Safety or take *any* action on the Kirtos claim from at least May 1985 until April 1992.

### B. *Second Notice to ACIC*

On April 9, 1992, at CRCC's request, Marsh advised ACIC that the Kirtos claim was still active.

By letter dated June 11, 1992, CRCC sent its Kirtos claim file dating back to April 1989, to ACIC and advised that it was continuing to investigate the claim in order to "better evaluate" the exposure for permanent total disability benefits ("PTD"). (June 11, 1992 letter attached to Sullivan Cert. as Ex. J.) The parties dispute whether the June 11, 1992 letter revealed that Kirtos had filed an application for PTD benefits which was then pending.

The letter did, however, provide ACIC with a summary of the amounts spent as of that date and CRCC's reserve analysis for the Kirtos claim. CRCC also informed ACIC that over $152,000 had been paid as TTD benefits, that more than $17,000 had been paid in medical expenses with $8,564 incurred but not paid, and that over $18,000 had been paid in other expenses. Moreover, the information provided by CRCC indicated that May had established a total reserve of $350,900 for the Kirtos claim, which was $100,000 above the $250,000 self-insured retention.

CRCC acknowledged in its June 11, 1992 letter that "any money [paid out] in excess of [its] self-insured retention of $250,000 would need prior approval from [ACIC's] office." Consequently, according to BICC, ACIC's claims examiner spoke to personnel at May on more than one occasion and was told that they did not expect the Kirtos claim to exceed the self-insured retention. (Deposition of R. Blaine Smith ("Smith Dep.") 38:16–23, attached to Sullivan Cert. as Ex. H.) Safety, however, disputes this fact, contending that the claims file contains no documentation of any such telephone contact between ACIC and CRCC.

While Safety claims that ACIC did not undertake any activity concerning the Kirtos claim between August 1992 and March 1994, BICC concedes only that the ACIC claims file does not include any documentation of such activity between CRCC and ACIC.

### C. *Third Notice to ACIC*

The Industrial Commission of Ohio awarded Kirtos PTD benefits on August 17, 1993. ACIC claims, and Safety disputes, that in or about March 1, 1994, ACIC learned for the first time that Kirtos had been awarded PTD benefits. As evidenced by a memorandum from ACIC's claims examiner, R. Blaine Smith ("Smith"), to ACIC's Assistant Vice President and Counsel, Luann Petrellis ("Petrellis"), dated March 23, 1994, ACIC knew, at least by that date, that Kirtos had been awarded PTD. (Deposition of Luann

Petrellis ("Petrellis Dep."), 76:8–77:16 and Ex. 10 of Petrellis Dep. attached to Pl.'s Appendix to Local Civil Rule 56.1 Statement, Vol. I as Ex. B.) In that March 23rd memorandum, Smith recommended to Petrellis that ACIC set an indemnity reserve of $100,000 for the Kirtos claim; the reserve was posted on April 1, 1994. ACIC had not previously established any reserve for the Kirtos claim.

## IV. *Notices to Safety*

### A. *First Notice to Safety*

In theory, when a reserve is established on a claim, ACIC's "ReBus" computer system is supposed to automatically generate a Reinsurance Loss Advice ("RLA"). (Deposition of Marilyn Evanousky ("Evanousky Dep.") Vol. I, 21:16–22:4, 22:9–11, attached to Sullivan Cert. as Ex. C.) Once an RLA is generated, ACIC's policy is to send the reinsurer the RLA in order to notify it of the loss and the posted reserve. (*Id.* at 22:22–23:11.)

BICC contends that the RLA recording the posted reserve of $100,000 on the Kirtos claim was generated on May 11, 1994 and sent to Safety along with a cover letter dated May 11, 1994. (*See* Evanousky Dep., Vol. II, 7:20–24.) The RLA, however, is dated May 13, 1994. (*See* RLA attached to Sullivan Cert. as Ex. P.) Relying on this fact, Safety argues that ACIC could not have mailed on May 11, 1994, an RLA that was not printed until two days later on May 13, 1994. In addition to claiming that it has no record of having received the RLA at any time in 1994, Safety also disputes that there were even any communications with ACIC concerning the Kirtos claim between May 1994 and July 1997. (Evanousky Dep., Vol. I, 84:18–21.)

### B. *Second Notice to Safety*

In May 1997, ACIC adjusted the reserves for the Kirtos claim to $91,464.74 due to ACIC's loss payment of $8,535.26. According to BICC, ACIC generated another RLA, which was forwarded to Safety in July 1997. That RLA and cover letter were returned to ACIC by the postal service for incorrect address. BICC and Safety dispute when the RLA and cover letter were resent to Safety.

In any event, by August 12, 1997, Safety responded to the Kirtos notice of loss. (*See* August 12, 1997 letter attached to Sullivan Cert. as Ex. R.) Subsequently, by letter dated December 3, 1998, ACIC advised Safety that it was increasing its reserves on the Kirtos claim to $200,000 to reflect the estimated cost of a $127,962 annuity to provide lifetime income and a medical annuity to Kirtos.

## V. *Procedural History*

On June 9, 1999, BICC filed suit against Safety in the New Jersey state court. The action was removed to federal court on July 14, 1999.

In the complaint, BICC seeks recovery of reinsurance balances allegedly due under the Facultative Reinsurance, plus interest. BICC also seeks a declaration that Safety is obligated to pay the ongoing amounts billed to Safety for losses incurred under the Facultative Reinsurance.

## VI. *DISCUSSION*

### A. *Choice of Law*

Although neither party identified or briefed which state's substantive law applies in this case, both sides agreed during oral argument that New Jersey substantive law applies. While Plaintiff is a Cayman Island corporation and Defendant is a Missouri corporation, New Jersey has the most significant relation and closest con-

tacts with the transaction and the parties. *See State Farm Mutual Auto. Ins. Co. v. Estate of Simmons,* 84 N.J. 28, 34, 417 A.2d 488 (1980); *Kaufman v. Provident Life and Cas. Ins. Co.,* 828 F.Supp. 275, 282 n. 10 (D.N.J.1992), *aff'd,* 993 F.2d 877 (3d Cir.1993); *Pancza v. Remco Baby, Inc.,* 761 F.Supp. 1164, 1168 (D.N.J.1991). According to the Complaint, at the time the reinsurance agreement was executed and in effect, ACIC's principal place of business was in New Jersey. (Compl., ¶ 3.) The Facultative Reinsurance includes a New Jersey address for May. (*See* Certificate of Facultative Reinsurance.) Further, Safety is licensed to do business in New Jersey. (Compl., ¶ 2.) Therefore, the Court will apply New Jersey substantive law to this matter.

## B. *Late Notice*

As quoted above, the Facultative Reinsurance contains a notice provision requiring the reinsured to "promptly" advise the reinsurer of any claim or subsequent developments, which "in the opinion of [BICC], may involve the reinsurance." (Certificate of Facultative Reinsurance, ¶ 4.)

■ While neither party cites to any New Jersey law, and instead relies on federal courts' interpretation of the law of various states, both parties agree that an objective standard applies to determine whether notice was timely. *See Zenith Ins. Co. v. Employers Ins. of Wausau,* 141 F.3d 300 (7th Cir.1998). Similar to the notice provision of the reinsurance policy at issue here, the notice provision in *Zenith* required the reinsured to give "prompt notice" to the reinsurer of any event or development that "in the judgment of the Reinsured, might result in a claim." *Id.* at 302. Although the reinsured emphasized the subjective element of the notice requirement, the Seventh Cir-

cuit agreed with the reinsurer and found that although the reinsured had "some discretion over when to provide notice and for what kinds of events, its discretion was tempered by an objective standard requiring notice to [the reinsurer] within a reasonable period of time of its realization that the claim could implicate the reinsurance policy." *Id.* at 306.

Moreover, because the Facultative Reinsurance requires notice as soon as a claim "*may* involve the reinsurance," there need not be a probability or certainty that the reinsurance will be involved for the notice provision to be triggered. *See Unigard Security Ins. Co., Inc. v. North River Ins. Co.,* 4 F.3d 1049, 1065 (2nd Cir.1993) ("a provision that requires notice when it 'appears likely to involve th[e] reinsurance,' does not require a 'probability-much less a certainty-that the policy at issue will be involved . . .' ") (citing *Christiania General Ins. Corp. v. Great American Ins. Co.,* 979 F.2d 268, 276 (2nd Cir.1992)). " 'All that is required is a 'reasonable possibility' of such happening, based on an objective assessment of the information available.' " *Id.*

■ Generally, what constitutes an insured's reasonable or timely notice to an insurer of an underlying claim

> depends on the facts and circumstances of the particular case, and it is a question of fact for resolution by the jury or fact-finder, unless the basic facts are undisputed and only one inference can reasonably be drawn therefrom.

*Peskin v. Liberty Mut. Ins. Co.,* 214 N.J.Super. 686, 694–95 (Law Div.1986), *aff'd in part and remanded,* 219 N.J.Super. 479, 530 A.2d 822 (App.Div.1987); *see also Trustees of the Univ. of Pennsylvania v. Lexington Ins. Co.,* 815 F.2d 890, 895 (3d Cir.1987) (rejecting reinsurer's claims that notice of claims was late as a matter

of law and finding that issue of late notice was properly a question for the jury in view of conflicting testimony).

In this case, there are clearly genuine issues of material fact concerning whether ACIC gave Safety notice of the Kirtos claim in May 1994. Notwithstanding that factual dispute, however, Safety argues that notice was untimely because it should have been provided earlier, either in April 1985 when ACIC first learned of the Kirtos claim, or at the latest, soon after CRCC wrote to ACIC in June 1992, informing ACIC that May had established a total reserve $100,000 above its $250,000 self-insured retention.

According to BICC, however, its notice obligation was not triggered until ACIC learned that Kirtos had been awarded permanent total disability benefits. BICC claims that it was not until then that ACIC reasonably determined that the underlying claim might involve the reinsurance provided by the Facultative Reinsurance. Therefore, BICC explains that ACIC's first notice to Safety by letter dated May 11, 1994 (three years before the underlying self-insured retention was exhausted), was timely.

While the question of when notice would have been timely is normally a fact question to be resolved by a jury, here, as discussed below, even assuming that ACIC gave notice to Safety of the Kirtos claim in 1994, the basic relevant facts are undisputed and from those facts, only one inference can reasonably be drawn—that providing notice nine years after ACIC initially learned of the underlying claim in 1985 was unreasonable. *See Peskin*, 214 N.J.Super. at 694–95, 520 A.2d 852.

### 1. *Notice in 1985*

■ BICC does not dispute that ACIC did not give notice to Safety any earlier than 1994. Nevertheless, BICC contends that at no earlier time did ACIC believe that the reinsurance policy might be implicated. First, BICC maintains that it was not required to notify Safety in 1985 because if a reinsured must notify its reinsurer every time it learns of a claim, then the purpose of reinsurance would be defeated. The purpose of reinsurance, BICC claims, is to enable the ceding insurance company to diversify its risk of loss and free capital so that it can invest or insure more risk; meanwhile, the reinsurer, with the premium it receives from the ceding company, gains capital without the costly obligation to evaluate underlying risks and handle claims. BICC therefore concludes that requiring a ceding insurer to notify its reinsurers as soon as it learns of a claim would impose an economic and administrative burden on the ceding company, which would reduce any benefits it gains by reinsuring its risk.

The Court, however, fails to see how sending a letter in 1985 to Safety to inform it of the existence of the underlying claim would have imposed an economic and administrative burden on ACIC or defeated the purpose of reinsurance. ACIC had already ceded a portion of its risk to Safety, thereby freeing capital; further, Safety was already receiving premiums from ACIC without the costly obligation to evaluate underlying risks and handle claims. Providing notice to Safety in 1985 would not have changed the purpose or nature of that reinsurance relationship. Moreover, contrary to what BICC seems to be suggesting, a ruling by this Court that ACIC's duty to give notice arose in 1985 would bear only on the particular facts of this case; it would not establish a bright-line rule requiring that all ceding insurance companies must notify its reinsurer every time and at the instant it learns of a claim.

Second, BICC argues that it properly opened and closed the Kirtos claim file in

1985 because CRCC's letter to ACIC of the claim was "an interpretation of the carriers' wishes to be notified" rather than an assessment that "the excess coverage will be involved." Although the CRCC letter indicated that it was not an assessment of the extent of coverage, it made no mention or conclusion that excess coverage would not be involved. To the contrary, the materials provided to ACIC in 1985 revealed that Kirtos would be receiving temporary and total disability benefits for 127 weeks. Despite such an evidently potentially serious claim, there is no dispute that from 1985 until at least April 1992, BICC failed to take any action whatsoever to investigate whether May's self-insured retention would be exceeded.

Finally, BICC suggests that notice was timely because it was not until another 7 years later that BICC would hear from CRCC on the Kirtos claim and another 12 years before May would exhaust its $250,000 self-insured retention. Those facts are, however, irrelevant in determining what ACIC's objective assessment of the information available in 1985 should have been at that time.

Therefore, BICC has failed to produce any evidence to rebut Safety's claim that ACIC's duty to provide notice arose in May of 1985.

### 2. *Notice in 1992*

■ Alternatively, even if ACIC's obligation to provide Safety notice of the Kirtos claim was not triggered in 1985, that duty certainly arose no later than 1992. An objective assessment of the information given to ACIC in 1992—that May had already paid over $152,000 in TTD benefits and had established a reserve $100,000 above its $250,000 self-insured retention—reveals that there was a reasonable possibility that the reinsurance would be involved.

BICC, however, contends that its belief that the reinsurance would not be reached was objectively reasonable because the self-insured retention did not take into account May's likelihood of success on the merits of the Kirtos claim. Moreover, BICC maintains that the June 11, 1992 letter did not reveal that Kirtos had filed an application for PTD benefits. Lastly, BICC claims that it relied on information from personnel at May and CRCC who advised ACIC's claims examiner that they did not expect the Kirtos claim to exceed the self-insured retention.

■ Such assertions, however, even if true, only establish that the involvement of the reinsurance was not certain; it does not undermine Safety's contention that it was clear in 1992 that the Kirtos claim *might* involve the reinsurance. Examining the information provided by CRCC to ACIC in 1992 under an objective standard, only one inference can be drawn—that the Kirtos claim might implicate the reinsurance policy, thereby giving rise to the reinsured's duty to notify its reinsurer. Therefore, when BICC waited until 1994 to allegedly send notice to Safety, the two year (from 1992 until 1994) or nine year (from 1985 until 1994) delay was unreasonable. BICC has presented no facts for a jury to find otherwise.

### C. *Prejudice*

### 1. *Standard*

BICC claims that even assuming that ACIC's notice to Safety of the Kirtos claim was untimely, it is entitled to summary judgment because Safety cannot show that it was prejudiced by the alleged late notice. Safety, however, contends that as long as ACIC failed to provide timely notice as required under the reinsurance policy, Safety need not show prejudice to be

released from its contractual indemnity obligation.

Under New Jersey law, it is well settled that for a primary insurance carrier to prevail on its late notice claim, it must show a likelihood of appreciable prejudice. *Cooper v. Government Employees Ins. Co.,* 51 N.J. 86, 93, 237 A.2d 870 (1968) ("[T]he carrier may not forfeit the bargained-for protection unless there are both a breach of the notice provision and a likelihood of appreciable prejudice"); *see also Pfizer, Inc. v. Employers Ins. of Wausau,* 154 N.J. 187, 206, 712 A.2d 634 (1998) ("New Jersey and many other jurisdictions require a showing of prejudice before a contract of insurance may be avoided"); *HM Holdings, Inc. v. Aetna Casualty & Surety Co.,* 154 N.J. 208, 216, 712 A.2d 645 (1998) (noting that justified expectations of insurance companies would not be frustrated if prejudice rule were applied to late notice claims); *Sagendorf v. Selective Ins. Co. of Am.,* 293 N.J.Super. 81, 96–97, 679 A.2d 709 (App.Div.1996) ("[A]n insurer's late-notice defense 'cannot be sustained unless the carrier satisfies the burden of proving that it suffered appreciable prejudice by reason of the insured's failure to comply.'" (citations omitted)).

The determination of whether appreciable prejudice exists is made in a two-part inquiry: (1) whether substantial rights have been irretrievably lost; and (2) the likelihood of success of the insurer in defending against the victim's claim. *Baen v. Farmers Mutual Fire Ins.,* 318 N.J.Super. 260, 271, 723 A.2d 636 (App.Div.1999) (citing *Morales v. National Grange Mut. Ins. Co.,* 176 N.J.Super. 347, 423 A.2d 325 (Law Div.1980)).

■ The New Jersey Supreme Court has yet to decide whether this rule requiring prejudice applies to reinsurers. Safety contends that the prejudice rule does not apply to reinsurance contracts. The Court agrees with that prediction.[2] The policy behind New Jersey's rule requiring prejudice in late notice claims "is to protect the interests of policyholders because insurance contracts are contracts of adhesion and policyholders should not lose the benefits of coverage unless the delay has prejudiced the insurance company." *Pfizer, Inc.,* 154 N.J. at 206, 712 A.2d 634 (citing *Cooper,* 51 N.J. at 94, 237 A.2d 870).

Reinsurance contracts, unlike primary insurance contracts, are not contracts of adhesion. Rather, "'[r]einsurance involves two sophisticated business entities familiar with the business of reinsurance who bargain at arms-length for the terms in their contract.'" *Stonewall Ins. Co. v. Argonaut Ins. Co.,* 75 F.Supp.2d 893, 909 (N.D.Ill.1999) (citing Steven W. Thomas, *Utmost Good Faith in Reinsurance: A Tradition in Need of Adjustment,* 41 Duke L.J. 1548, 1554 (June 1992)). Accordingly, BICC cannot argue that the policy behind the prejudice rule applies to reinsurance contracts.

Moreover, in addition to not being a contract of adhesion, another distinction is that "[a] contract of reinsurance is really not a contract of insurance as much as it is a contract of indemnity." *Vera Democrazia Soc. v. Bankers' Nat'l Life Ins. Co.,* 10 N.J.Misc. 632, 633–34, 160 A. 767 (1932); *Stonewall,* 75 F.Supp.2d at 909. Therefore, there is no reason to extend to reinsurance contracts the rule that insurance policies should be construed most strictly against the insurance company. *Id.; see also Unigard,* 4 F.3d at 1065 ("[C]anons of

**2.** In view of the Court's determination on the prejudice issue, the Court need not address Safety's claim that ACIC is judicially estopped from arguing that a showing of prejudice is required.

construction that protect individual purchasers of original insurance policies do not apply to reinsurance.")

Accordingly, absent any indication by the New Jersey Supreme Court that the prejudice requirement in late notice cases extends to the reinsurance context or that the same rules of construction that apply to insurance contracts apply to reinsurance contracts, this Court declines to add terms to the Facultative Reinsurance that were not expressly negotiated or bargained for by the parties. *See American Centennial Ins. Co. v. Warner–Lambert Co.*, 293 N.J.Super. 567, 575, 681 A.2d 1241 (Law Div.1995) (holding that rule requiring appreciable prejudice in late notice cases does not apply to situations involving excess carriers); *see also Liberty Mutual*, 773 F.2d at 18 (noting that reasons for imposing prejudice requirement in late notice cases did not apply to reinsurance contracts involving experienced insurance underwriters who bargain at arm's length).[3]

## VII. *CONCLUSION*

Based on an objective assessment of the information provided to ACIC in 1985 and 1992, there was a reasonable probability that the reinsurance would be involved. Therefore, ACIC's notice to Safety, which at the earliest, was not provided until 1994, was untimely. BICC's motion for summary judgment is denied.

Having determined that BICC's predecessor-in-interest failed to provide timely notice in accordance with the terms of the

Facultative Reinsurance and that New Jersey law does not require a showing of prejudice to prevail on a late notice defense, Safety's cross motion for summary judgment is granted.

---

**3.** The Court notes that *Trustees of the Univ. of Pennsylvania*, 815 F.2d 890, a case neither party relies on for the proposition that a showing of prejudice is required to escape liability, was decided under Pennsylvania law and is therefore not dispositive here. Likewise, although there have been decisions in other jurisdictions requiring a showing of prejudice on a late notice claim, none involved the application of New Jersey law. *See e.g. Unigard Security Ins. Co., Inc. v. North River Ins. Co.*, 79 N.Y.2d 576, 584 N.Y.S.2d 290, 594 N.E.2d 571 (Ct.App.1992); *Unigard*, 4 F.3d at 1067–69; *Ins. Co. of the State of Pennsylvania v. Associated Int'l Ins. Co.*, 922 F.2d 516, 523 (9th Cir.1990); *Christiania General Ins. Corp. v. Great Am. Ins. Co.*, 979 F.2d 268, 274 (2nd Cir.1992).