NL INDUSTRIES, INC., Plaintiff,

v.

COMMERCIAL UNION INS. COS., Defendant.

COMMERCIAL UNION INS. COS., Third–Party Plaintiff,

v.

CERTAIN UNDERWRITERS AT LLOYD'S, et al., Third– Party Defendants.

NL INDUSTRIES, INC., Plaintiff,

v.

CERTAIN UNDERWRITERS AT LLOYD'S, et al., Third– Party Defendants.

Civ. No. 90–2125 (WHW).

United States District Court, D. New Jersey.

May 23, 1996.

As Amended June 11, 1996.

**1216**

Andrew T. Berry, Kevin J. Connell, McCarter & English, Newark, New Jersey, for Plaintiff NL Industries, Inc.

Joni F. Mason, Rivkin, Radler & Kremer, Newark, New Jersey, for Defendant Commercial Union Insurance Co.

Michael J. O'Mara, Crawshaw, Mayfield, Riordan, Turner, O'Mara, Donnelly, Thomas & McBride, Cherry Hill, New Jersey, for Defendant Lexington Insurance Co.

Joseph R. McDonough, Graham, Curtin & Sheridan, Morristown, New Jersey, for Defendant Insurance Company of North America.

Mitchell S. Cohen, Mound, Cotton & Wollan, New York City, for Defendant International Insurance Co.

Edward G. D'Alessandro, Jr., D'Alessandro & Jacovino, Florham Park, New Jersey, for Defendant International Surplus Lines Insurance Co.

William B. McGuire, Tompkins, McGuire & Wachenfeld, Newark, New Jersey, for Defendant Certain Underwriters at Lloyd's.

Agnes A. Reiss, Cuyler Burk, Parsippany, New Jersey, for Allstate Insurance Co., successor-in-interest to Defendant Northbrook Excess and Surplus Insurance Co.

## OPINION

WALLS, District Judge.

In this action, NL Industries, Inc. ("NL") seeks a declaration of the responsibilities of the defendants and third-party defendants under various comprehensive general liability ("CGL") and environmental impairment liability ("EIL") insurance policies for NL's liability for property damage and bodily injury allegedly resulting from environmental contamination at various sites (the "environmental claims") and exposure to chemicals and other substances (the "miscellaneous claims"). It also wants damages for breach of contractual duties under the policies.

NL and seven of the insurers now move for partial summary judgment with regard to choice of law on the environmental claims.

## I. *Background*

On May 30, 1990, NL filed two complaints against CU. The first, No. 90–2124, asked the Court to determine CU's duties with regard to certain products liability claims. The second, the one currently before the Court, requested the same relief with regard to the environmental and other claims. NL later identified 125 specific environmental

claims as well as 224 miscellaneous claims. Subsequently, NL added 15 new environmental claims, for a total of 140. These 140 claims involve 93 sites in 28 states. Of the 140 claims, 45 are in New Jersey, 17 in Texas, 9 in Pennsylvania, 8 in Michigan, 7 in California, 6 in Illinois, 6 in Missouri, and the rest are scattered in 21 other states. See International Surplus Br., at 10–11. Of the 93 sites, 21 are in New Jersey.[1] Id. at 11.

CU then impleaded Certain Underwriters at Lloyd's and other British Companies ("Lloyd's"), Insurance Company of North America ("INA"), and Northbrook Excess and Surplus Insurance Co. ("Northbrook"). Later, NL filed an amended complaint, adding some claims and parties. Besides CU, the amended complaint seeks relief against 14 other defendants and third-party defendants: Aetna Casualty & Surety Co. of America ("Aetna"), Lexington Insurance Co. ("Lexington"), Midland Insurance Co. ("Midland"), First State Insurance Co. ("First State"), American Centennial Insurance Co. ("American Centennial"), Stonewall Underwriters,[2] Utica Mutual Insurance Co. ("Utica"), National Union Fire Insurance Co. of Pittsburgh, PA ("National Union"), International Insurance Co. ("IIC"), International Surplus Lines Insurance Co. ("International Surplus"), Evanston Insurance Co. ("Evanston"), and Lloyd's, INA, and Northbrook. Subsequently, the Court dismissed NL's claims against National Union, American Centennial, and Evanston.

In January 1991, the magistrate judge ordered that discovery focus on 20 representative sites, 10 chosen by NL and 10 by the insurers. Since two of NL's sites were identical to two of the insurers, discovery focused on a total of 18 sites.

In January 1993, the magistrate judge stayed discovery with regard to four of the 18 sites, and told the parties to select sites to be subject to summary judgment motions and trial. In April 1993, the parties jointly selected two sites—one in Granite City, Illinois (the "Granite City site") and the other in

Portland, Oregon (the "Portland site"). Evidently, each site only reflects one claim.

In May 1993, the Court granted International Surplus and IIC's motion for summary judgment as to various claims, including those arising from Portland site, and denied their motion with regard to the Granite City site.

NL first moved for partial summary judgment against CU on choice of law with regard to both the product liability and environmental claims in November 1990. In July 1991, the then District Judge granted both motions, applying New Jersey law. In making this determination, he followed the then-controlling New Jersey Supreme Court opinion, *State Farm Mutual Automobile Insurance Co. v. Estate of Simmons*, 84 N.J. 28, 417 A.2d 488 (1980). CU did not appeal. Rather, NL and CU entered into a settlement under which CU agreed to pay NL's defense costs regarding the product liability claims.

Subsequently, additional product liability claims were filed against NL. When CU declined to pay NL's defense costs for these, NL again moved for partial summary judgment against CU for choice of law. In response, CU argued that a recent New Jersey Supreme Court opinion, *Gilbert Spruance Co. v. Pennsylvania Manufacturers' Association Insurance Co.*, 134 N.J. 96, 629 A.2d 885 (1993), had changed the law in this area. Under *Gilbert Spruance*, CU claimed, the Court should apply New York, rather than New Jersey, law.

In May 1994, that District Judge granted NL's motion for partial summary judgment against CU, applying New Jersey law to *both* the product liability and environment claims. On appeal, the Third Circuit reversed. The Third Circuit noted that the District Court had wrongly "conflated the environmental coverage action with the lead paint coverage action." *NL Industries, Inc. v. Commercial Union Ins. Co.*, 65 F.3d 314, 324 n. 8 (3d Cir.1995). Further, it ruled that

---

**1.** At oral argument, the other parties conceded that these numbers "sound[ed] correct" or were "approximately" correct.

**2.** Stonewall Insurance Company ("Stonewall") was later substituted for Stonewall Underwriters.

[a]fter *Gilbert Spruance*, New Jersey's choice of law rules require not only that environmental coverage claims be considered separately from other claims (such as for product liability), but also that they be considered in the site-specific framework, which is distinct from the customary, modified contacts analysis still applicable in other coverage contexts.

*Id.* at 323. While the Third Circuit held that New York law should apply to the product liability claims, it explicitly noted that "[w]e do not reach the other claims [e.g., the environmental claims]." *Id.* at 329.

Now, NL moves again for partial summary judgment, arguing that, with regard to the environmental claims, this Court should apply New Jersey law to all the sites. Seven of the insurers—CU, INA, IIC, Lloyd's, Lexington, International Surplus, and Allstate (as successor-in-interest to Northbrook)—also move for partial summary judgment. However, they contend that the Court should apply New York law or, in the alternative, Illinois and/or Oregon law.

## II. *Analysis*

### A. *Whether a choice-of-law question arises in this matter*

NL requests that the Court make a choice of law decision for all of the environmental sites in this case, not just the two representative sites. The Court will deal with this request below. However, for now, four states clearly have an interest in the substantive issues raised in this motion: New Jersey, New York, Illinois, and Oregon.

Before a choice-of-law question arises, though, there must actually be a conflict between the potentially applicable bodies of law. *See Oil Shipping B.V. v. Sonmez Denizcilik Ve Ticaret A.S.*, 10 F.3d 1015, 1018 (3d Cir.1993). If the laws of the forum state and those of the relevant foreign jurisdiction do not differ, there is a "false conflict" and the court need not decide the choice-of-law issue. *In re Complaint of Bankers Trust Co.*, 752 F.2d 874, 882 (3d Cir.1984).

A choice-of-law issue arises in this matter because the Court's resolution of at least two important legal questions in this lawsuit depends in part on what state's law it applies. *See Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir.1994). First, the states have variously interpreted the "sudden and accidental" discharge exception found in the pollution-exclusion clause of the comprehensive liability policies such as those issued to NL in this case. In *Morton International, Inc. v. General Accident Insurance Co. of America*, 134 N.J. 1, 629 A.2d 831 (1993), the New Jersey Supreme Court interpreted the standard "sudden and accidental" exception as having a temporal element, and describing discharges of pollutants that "occur abruptly or unexpectedly and are unintended." *Id.* at 29, 629 A.2d 831. However, the court refused to enforce the standard pollution-exclusion clause as written. It noted that, in obtaining regulatory approval for this language, the insurance industry had "grossly mislead[ ]" New Jersey and other states' insurance regulatory agencies as to the clause's actual effect on coverage for pollution damage. Thus, the court ruled that it would give effect to the clause "only to the extent that it shall preclude coverage for pollution-caused property damage caused by an 'occurrence' if the insured intentionally discharged, dispersed, released, or caused the escape of a known pollutant."[3] *Id.* at 31, 629 A.2d 831.

---

3. Four of the insurers named in the amended complaint (i.e., IIC, International Surplus, National Union, and Evanston, collectively the "EIL insurers") did not issue "occurrence"-type CGL insurance to NL. Rather, they issued "claims made" environmental impairment liability ("EIL") insurance. National Union and Evanston are no longer in this litigation. Moreover, the Court has dismissed the claims against IIC and International Surplus arising from the Portland site (though not the Granite City site).

IIC, one of these EIL insurers, claims that *Morton's* regulatory estoppel or public policy rationale should not apply to it with regard to the Granite City site. This is because EIL coverage did not exist when the insurance industry sought approval of the standard CGL pollution-exclusion clause in 1970.

Allstate, as successor-in-interest to Northbrook, also argues that *Morton's* regulatory estoppel or public policy rationale should not apply to it. Among other arguments, Allstate asserts that Northbrook "came into being" in 1972, two years after the industry sought approval of the pollution-exclusion clause.

The Court deals with these issues below.

The Illinois Supreme Court also held in favor of the insured with regard to the standard pollution-exclusion clause, however on different grounds. In *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992), the court determined that the term "sudden," as in "sudden and accidental," was ambiguous, and thus should be construed against the insurer. Hence, it found that "sudden" should be interpreted to mean "unexpected and unintended." *Id.* at 705, 607 N.E.2d at 1218.

Conversely, the New York Appellate Division has interpreted "sudden" by its "ordinary meaning," namely, as having a "temporal significance"; it suggested one definition as "abrupt." *See Technicon Electronics Corp. v. American Home Assurance Co.*, 141 A.D.2d 124, 533 N.Y.S.2d 91, 101, 103 (1988), *aff'd*, 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989). The New York Court of Appeals has not clearly ruled on this question. *See Technicon Electronics Corp. v. American Home Assurance Co.*, 74 N.Y.2d 66, 544 N.Y.S.2d 531, 534, 542 N.E.2d 1048, 1051 (1989) (noting that "we need not rule on the [issue of] suddenness ... because it would be superfluous here"). Like its sister court in New York, the Oregon Court of Appeals has also determined that "sudden" is unambiguous, and that it excludes coverage for liability arising from gradual contamination. *See St. Paul Fire & Marine Ins. Co. v. McCormick & Baxter Creosoting Co.*, 126 Or.App. 689, 870 P.2d 260, 269, *modified on other grounds*, 128 Or.App. 234, 875 P.2d 537 (1994), *review allowed*, 322 Or. 362, 907 P.2d 248 (1995). However, the Oregon Supreme Court has granted review of *St. Paul*, and a more definitive ruling on this issue is expected.

Second, the states have interpreted the issue of "late notice" differently. Normally, insurance policies such as those in this case require insureds to give notice of an occurrence as soon as practicable and notice of a claim or suit immediately. If they do not, then the insurer may have a defense against coverage. Apparently, that is an issue in this case. Both New York and Illinois permit insurers to avoid coverage if the insured has provided late notice, even if the insurer did not suffer any prejudice as a result of the insured's dilatoriness. *See Industrial Coatings Group, Inc. v. American Motorists Ins. Co.*, 276 Ill.App.3d 799, 213 Ill.Dec. 317, 322, 658 N.E.2d 1338, 1343 (1995); *Heydt Contracting Corp. v. American Home Assur. Co.*, 146 A.D.2d 497, 536 N.Y.S.2d 770, 773 *appeal dismissed*, 74 N.Y.2d 651, 542 N.Y.S.2d 520, 540 N.E.2d 715 (1989). At the opposite extreme, Oregon requires an insurer to demonstrate prejudice in order to prevail on a late notice defense. *Lusch v. Aetna Cas. & Sur. Co.*, 272 Or. 593, 538 P.2d 902, 904 (1975). New Jersey opts for the middle ground. It requires an insurer attempting to avoid coverage because of late notice to demonstrate the likelihood of appreciable prejudice. *See Peskin v. Liberty Mut. Ins. Co.*, 214 N.J.Super. 686, 694, 520 A.2d 852 (N.J.Super.1986), *aff'd in part, remanded in part*, 219 N.J.Super. 479, 530 A.2d 822 (App.Div.1987); *also see Molyneaux v. Molyneaux*, 230 N.J.Super. 169, 177, 553 A.2d 49 (App.Div.1989) (noting that the Appellate Division in *Peskin* "reaffirmed the need to apply the appreciable prejudice test ... in cases involving late notice to a carrier").

### B. *Determining choice of law*
#### 1. *New Jersey choice-of-law rules*

A federal court exercising diversity jurisdiction should apply the choice-of-law rules of the forum state. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Hence, the Court turns to the applicable New Jersey case law.

*State Farm Mutual Automobile Insurance Co. v. Estate of Simmons*, 84 N.J. 28, 417 A.2d 488 (1980), involved a situation where the New Jersey Supreme Court needed to determine whether New Jersey or Alabama law should determine coverage under an automobile insurance contract. In resolving this choice-of-law problem, the court relied primarily on §§ 6, 188, and 193 of the Restatement (Second) of Conflict of Laws (the "Restatement").

Section 188(1) states that, absent a choice-of-law provision in a contract, the parties' rights and duties under the contract are de-

termined by the law of the state that "has the most significant relationship to the transaction and the parties under the principles stated in § 6." Restatement, § 188(1), at 575; *see State Farm*, 84 N.J. at 34, 417 A.2d 488. Section 188(2) further notes that "the contacts to be taken into account in applying the principles of § 6 to determine the" applicable law include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

*Id.* Moreover, § 188(3) provides that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.*

Section 6(2) then lists the "factors relevant to the choice of the applicable rule of law....," which are:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement, § 6(2), at 10; *see State Farm*, 84 N.J. at 34, 417 A.2d 488. Section 193 provides that insurance contracts are governed

by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the ... law of the other state will be applied.

Restatement, § 193, at 610; *see State Farm*, 84 N.J. at 35, 417 A.2d 488.

The *State Farm* court concluded that

the proper approach in resolving conflict-of-law issues in liability insurance contract controversies ... calls for recognition of the rule that the law of the place of the contract ordinarily governs the choice of law because this rule will generally comport with the reasonable expectations of the parties concerning the principal situs of the insured risk during the term of the policy and will furnish needed certainty and consistency in the selection of the applicable law.

*State Farm*, 84 N.J. at 36, 417 A.2d 488 (citations omitted). However, its holding was somewhat more narrow. As it stated,

[w]e ... hold that, in an action involving the interpretation of an automobile liability contract, the law of the place of the contract will govern the determination of the rights and liabilities of the parties under the insurance policy ... unless the dominant and significant relationship of another state to the parties and the underlying issue dictates that this basic rule should yield.

*Id.*

The New Jersey Supreme Court, Justice Clifford writing, revisited this area 13 years later in *Gilbert Spruance Co. v. Pennsylvania Manufacturers' Association Insurance Co.*, 134 N.J. 96, 629 A.2d 885 (1993). Here, though, the issue was very similar to that in the instant case. Just as in this lawsuit, an insured sued its insurer seeking a declaration that, under its CGL policy, the insurer had a duty to defend against certain environmental claims arising from contamination at various sites. As a preliminary matter, though, a couple of differences between *Gilbert Spruance* and this case are noted. First, *Gilbert Spruance* involved a Pennsylvania insured and insurer. Second, all the sites in question were in New Jersey. In contrast, this case is considerably more complex. It involves an insured who is based in New Jersey and Texas (and who was based in New Jersey and New York at the time the contracts were

entered into), and 11 insurers based, respectively, in Massachusetts (CU), Delaware and Pennsylvania (INA), Illinois (Northbrook), Connecticut (Aetna), Delaware and Massachusetts (Lexington), Delaware and Massachusetts (First State), Alabama (Stonewall), New York (Utica), Illinois (IIC), Illinois (International Surplus), and the United Kingdom (Lloyd's).[4] Moreover, it involves sites in some 28 states, including New Jersey, Texas, Pennsylvania, Michigan, California, and Illinois.

In *Gilbert Spruance*, the court, following *State Farm*, referred to the analysis embodied in §§ 6, 188, and 193 of the Restatement. However, unlike the *State Farm* court, it paid particular attention to § 193 and did not apply § 188. This is because a possible conflict existed between §§ 188 and 193 in *Gilbert Spruance*, but not in *State Farm*. Thus, as the *Gilbert Spruance* court recognized, § 193 must supplant § 188.

In *State Farm*, for example, it was obvious that not only was Alabama both the state of contracting and the state with the most significant relationship to the parties and the transaction, but it was also the state that the parties clearly understood was the principal location of the insured risk. In other words, the §§ 188 and 193 tests lead readily to the same result—the application of Alabama law; so there was no reason why the Court should not invoke both. In *Gilbert Spruance*, though, the §§ 188 and 193 tests were potentially contradictory. On the one hand, there were numerous § 188(2) contacts with Pennsylvania; the contracts were negotiated and entered in Pennsylvania, the premiums were paid in Pennsylvania, the locations of covered plant operations explicitly included Pennsylvania (as well as Virginia and North Carolina), and both the insured and insurer were from Pennsylvania. On the other hand, the wastes in question had been foreseeably transported to sites in New Jersey. Hence, the court was careful to emphasize that while § 188 "provides the choice-of-law rule in respect of contracts *in general*, ... section 193 provides guidance in applying section 188's 'relevant contacts' to the *special case* of casualty-insurance contracts, such as CGL poli-

cies." *Id.* at 103, 629 A.2d 885 (emphasis added). Accordingly, the Court relied heavily on § 193 in its analysis, and did not apply § 188 at all. *See also General Ceramics Inc. v. Firemen's Fund Ins. Cos.*, 66 F.3d 647, 655-59 (3d Cir.1995) (suggesting that under *Gilbert Spruance* a court dealing with CGL contracts and environmental claims need only apply § 193 and then § 6, rather than § 188 as well); *NL Industries*, 65 F.3d at 321 (noting that a court should look to *State Farm* for the proper choice of law analysis for product liability insurance controversies and *Gilbert Spruance* for environmental insurance disputes). As the *Gilbert Spruance* court noted,

> we conclude that in determining the choice-of-law rule to govern casualty-insurance contracts, such as the CGL policies in this case, we look first to ... section 193. As stated previously, that section provides that the law of the state that "the parties understood was to be the principal location of the insured risk ... [governs unless] some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties...." However, in certain cases when the "subject matter of the insurance is an operation or activity" and when "that operation or activity is predictably multistate, the significance of the principal location of the insured risk diminishes...." In such situations, the governing law is that of the state with the dominant significant relationship according to the principles set forth in ... section 6.

*Gilbert Spruance*, 134 N.J. at 111, 629 A.2d 885 (citations omitted).

Next, the court examined the § 193 issue of where the insured risk was located. It noted that this was a difficult question in the case because the relevant waste was generated in Pennsylvania and disposed in New Jersey. It could (1) arbitrarily pick either the state of generation or the state of disposal to be the location of the insured risk or (2), "because the risk at issue here was to some degree transient," opt to apply a more extended analysis under § 6(2). *Id.* at 113, 629

---

4. Midland does not seem to have made an appearance in this litigation.

A.2d 885 (citation omitted). It chose the latter. Hence, the court stated that

> [s]ubstantially for the reasons expressed ... in [*Leksi, Inc. v. Federal Ins. Co.,* 736 F.Supp. 1331, 1334–37 (1990),][5] ... when applying the principles enunciated in ... section 6 to a case in which out-of-state generated waste foreseeably comes to rest in New Jersey, New Jersey has the dominant significant relationship. That section 6 analysis is based on factors specific to New Jersey, such as our "urgent concern for the health and safety of [our] citizens" as "demonstrated by the enactment of [various environmental statutes]."

*Id.* (citations omitted).

The court specifically

> express[ed] no view on the proposition stated in *J. Josephson, Inc.* [*v. Crum & Forster Ins. Co.,* 265 N.J.Super. 230, 626 A.2d 81 (Super.1993)*]* that when another state is the foreseeable location of the waste-site, the court must engage in a section 6 analysis to determine if that state has the most significant relationship with the parties, the transaction, and the outcome of the controversy—an analysis that requires the court "to sift through and analyze, however laborious [the task], the competing and varied interests of the states involved...."

*Id.* at 114, 629 A.2d 885 (citation omitted). However, the court stated that it "necessarily reject[ed]" what it called the "uniform-contract-interpretation approach," *id.*, the notion that "the law of a single forum governs the interpretation of coverage under a casualty-insurance policy for multi-state claims arising from environmental damage in multiple jurisdictions." *Id.* at 104, 629 A.2d 885 (citations omitted). It did so, it averred, "substantially for the reasons stated by the Appellate Division" in the case below, *Gilbert Spruance Co. v. Pennsylvania Manufacturers' Ass'n Ins. Co.,* 254 N.J.Super. 43, 49–50, 603 A.2d 61 (App.Div.1992), and "by the court in *Johnson Matthey v. Pennsylvania Manufacturers' Ass'n Ins. Co.,*" 250 N.J.Super. 51, 58–63, 593 A.2d 367 (App.Div.1991). As additional support, it quoted the following statement from a federal district court:

> ... the existing dichotomous lines of substantive rulings, the maze of conflicts laws and litigation strategies of insureds and insurers alike make the achievement of ... uniformity [of interpretation of insurance contracts in the environmental area] an illusion. The next best available alternative—required by the interests of the fair and sound administration of justice—is the deliberate and impartial resolution of the issues by the courts of the states whose interests are immediately affected during the course of litigation which can be effectively managed.

*Travelers Indem. Co. v. Allied–Signal, Inc.,* 718 F.Supp. 1252, 1258 (D.Md.1989).

This Court now turns to the reasoning in the Appellate Division's opinion in *Johnson Matthey* and *Gilbert Spruance* with which the Supreme Court "substantially" agreed.

*Johnson Matthey* involved a Pennsylvania insured that shipped waste from Pennsylvania to sites in New Jersey. The Appellate Division held that New Jersey applied. The court conceded that Pennsylvania was "the locale of much of the creation of the insurance contracts," but called this interest "relatively remote." *Id.* at 58, 593 A.2d 367. It stated that Pennsylvania "has no legitimate interest ... in preventing the fair and predictable application of foreign law to Pennsylvania insurance contracts which are written to cover insureds' liabilities in other states." *Id.* The court noted that any interest Pennsylvania might have "in the uniform interpretation of Pennsylvania insurance contracts in other states" was an "illusory" goal "and must give way to New Jersey's paramount interest in the health and safety of its people." *Id.*

The court maintained that if an insured "had plants in 50 states, and its insurer was qualified to do business in all of them, its policy would cover 'sudden and accidental' discharges and other liabilities in 50 states. In that case, the insurer would cover [the insured] under 50 bodies of law." *Id.* The court also found that this was true for interpreting insurance contracts because "uniform

---

**5.** These reasons are those relating to the *Leksi* court's application of the § 6(2) factors.

interpretation [did not have] sufficient value to overcome the significant governmental interest of the various jurisdictions where the insured risks are located, or where the insured entity predictably is going to incur legal liabilities." *Id.* at 59, 593 A.2d 367. In other words, in theory, there would be no reason why a single comprehensive general insurance contract could not be interpreted under 50 different state laws. As the Court stated, "Predictability can be achieved just as easily with reference to 50 bodies of law as one. It is just that 50 are harder to keep track of." *Id.* As far as uniformity was concerned, the Court pointed out that if an insurer really cares much about this, it will insert a choice-of-law clause in its policies.

The Court then went on to hold that

a casualty insurance policy, wherever written, which is purchased to cover a New Jersey risk, alone or along with risks in other states, is subject to interpretation of its coverage and exclusion language according to New Jersey local law..... [T]his rule is peculiarly suitable to environmental litigation, in which large numbers of casualty insurance policies are involved....

*Id.* at 61, 593 A.2d 367.

The Appellate Division opinion in *Gilbert Spruance* echoed *Johnson Matthey* (both, incidentally, were written by the same author, Judge R.S. Cohen). This opinion summarized *Johnson Matthey* as follows:

[W]e concluded that nationwide uniformity of policy interpretation was an illusory goal, not truly achievable or necessarily preferable. If it is associated with the place of the contract, it is associated with an arbitrary and usually irrelevant choice which § 193 ... discards. Site-specific uniformity, on the other hand, is achievable, and represents a choice of the law of the jurisdiction that is most concerned with the outcome.

*Gilbert Spruance,* 254 N.J.Super. 43, 49, 603 A.2d 61 (App.Div.1992).

Other later cases have made similar points. In *NL Industries,* for example, the Third Circuit noted that "[a]fter *Gilbert Spruance,* New Jersey's choice of law rules require .. environmental coverage claims ... be considered in the site-specific framework, which is distinct from the customary, modified contracts analysis still applicable in other coverage contexts." *NL Industries,* 65 F.3d at 323.

### 2. *Section 193*

■ This Court will now determine which state's law to apply to the sites at hand. Following the New Jersey Supreme Court's lead, it looks first to § 193. The preliminary issue, then, is what state or states, if any, the parties understood to be the principal location of the insured risk. In deciding this issue, the Court is guided by § 193's comment f. This comment governs "multiple risk policies which insure against risks located in several states," as is the situation in this case. Assume, for instance, that a CGL policy covers sites in states X, Y, and Z. If so, comment f generally requires the Court to treat this situation as if it involved three policies, each insuring an individual risk. Thus, if a claim arose from a site located in state X, the Court would determine the rights and obligations of the parties under the policy, with regard to most issues, in accordance with the law of state X. Given the facts at issue here, then, comment f directs the Court to apply Illinois law to the Granite City site and Oregon law to the Portland site.

■ The parties have little to say in response on this issue. Indeed, all but one of the parties ignored comment f in their briefs.[6] First, the insurers claim that they "expected" New York law to apply because New York was the locus of many of the events leading up and including the execution of the contracts, and because of NL's myriad links to New York (at least at the time that the contracts were signed). This argument, though, is beside the point. *Gilbert Spruance* clearly instructs the Court to focus first on § 193, and this section explicitly looks to the *"principal location of the insured risk."* This location is simply the main state where

6. In a footnote, IIC contends that "[w]ere the Court to find Section 193 applicable, ... it could only do so in the context of Comment (f) to Section 193...." IIC Br., at 3 n. 2.

the wastes at issue were generated or disposed. *Gilbert Spruance*, 134 N.J. at 113, 629 A.2d 885.

■ Second, the insurers cite comment b of § 193 for the proposition that the location of the insured risk is not particularly important here because the sites in question are dispersed in so many different states. Comment b, though, states that situations where the risk cannot be principally located in one state

> and where the location of the risk has less significance, include (1) where the insured object will be more or less constantly on the move from state to state during the term of the policy *and* (2) where the policy covers a group of risks that are scattered throughout two or more states.

Restatement § 193, Comment b, at 611 (emphasis added). However, this "less significant" language does not really apply in this case. Rather, comment b primarily seeks to distinguish between moveable risks (i.e., chattels) and immoveable ones. It would be relevant, for instance, where wastes were generated in some states and routinely disposed of in other states.[7] Here, there is no such allegation. Wastes at the Granite City site were generated and disposed of in the same general locale, and the same is true for wastes at the Portland site. For instance, the insurers allege that, at the Granite City site, NL drained sulfuric acid on the ground, generated large quantities of fugitive flue (and other) dust, and dumped slag, matte, battery casings, and other wastes into a large pile on the property. At the Portland site, the insurers claim, NL permitted sulfuric acid to leak and spill on the ground and into a nearby lake, disposed of battery casings as well as slag and matte accumulations next to and in the lake, and allowed lead dust to circulate. The insurers do *not* allege that the wastes in question were foreseeably moved across state lines, and there is no evidence in the record to that effect. Moreover, as comment b provides, if a risk is in "a particular state for the *major portion* of the insurance period, the risk's principal location is *the most important contact* to be considered in the choice of the applicable law...." *Id.* (emphasis added).

■ Third, NL suggests that New Jersey is the location of the insured risk because a large number of the claims at issue involve sites in New Jersey. Specifically, about 32 percent of the claims arise from sites in New Jersey, and about 22 percent of the sites themselves are in New Jersey. Unfortunately, New Jersey enjoys the dubious distinction of being the number one state in both number of claims and sites in this litigation. While this numerosity argument has some superficial attraction, it finds no support in § 193, the rest of the Restatement, or the case law. Not only does this argument ignore comments b and f as well as controlling New Jersey Supreme Court precedent, but is otherwise unpersuasive. It is highly doubtful that, when the parties entered into the contracts or during the term of these contracts, they anticipated that policy-interpretation questions would be governed by the law of the state that generated the most claims or, for that matter, the state that accumulated the most number of sites provoking such claims. Such a result would be arbitrary and unpredictable. Moreover, it would fly in the face of uniformity. If the Court accepted NL's argument and then, say, Texas edged past New Jersey in terms of gross number of claims, the Court would presumably have to switch to Texas law.

Accordingly, the Court finds that the parties understood that, during the term of the contracts, the principal location of the insured risk at the Granite City site was in Illinois and that the principal location of the insured risk at the Portland site was in Oregon. Therefore, Illinois law should apply to the Granite City site and Oregon law to the Portland site, unless, with regard to the particular issues at stake in this litigation, some

---

7. The Third Circuit evidently found comment b relevant in *General Ceramics*. This was because the waste in question—unlike that in this matter—was "to some degree transient." *General Ceramics*, 66 F.3d at 655 (*quoting Gilbert Spruance*, 134 N.J. at 113, 629 A.2d 885). In fact, the waste was generated in New Jersey and was foreseeably disposed in "nearby" Pennsylvania. *Id.* Thus, not surprisingly, the Third Circuit determined that the location of the risk was "less significan[t]." *Id.*

other state has a more significant relationship under the § 6 principles to the transactions and parties.

The Court now turns to this § 6 analysis.

### 3. *Section 6 analysis*

 There are seven relevant factors here. For convenience, the Court will follow the lead of the Third Circuit and reduce these factors to five "interest groups." *See General Ceramics,* 66 F.3d at 656. These include:

(1) the purposes and policies behind each of the competing rules of law and the interests of each respective state in having its particular rules govern,

(2) where interstate or foreign commerce is involved, the desirability of promoting mutually harmonious relationships between governmental entities,

(3) the protection of justified expectations of the parties and the parties' needs for predictability of result,

(4) the basic policy underlying the particular field of law involved, and

(5) the concerns of judicial administration, such as which of the competing rules will simplify the determination and application of the applicable law.

*Id.* In applying these categories, the Court must consider them in light of *each* particular issue and competing rule. As the Third Circuit has stated, "[T]he New Jersey Supreme Court [in *Gilbert Spruance*] has demonstrated a willingness to countenance the application of different state laws even to a single issue of coverage. This may of course be quite difficult and time-consuming. . . ." *NL Industries,* 65 F.3d at 322 n. 6.

Moreover, following the Third Circuit's interpretation of *Gilbert Spruance,* the Court should stress the first category and deemphasize the last. *See General Ceramics,* 66 F.3d at 656.

### a. *Interests of the relevant states*

 As noted above, four states have an asserted interest here: New Jersey, New York, Illinois, and Oregon. Under the applicable reasoning of *Johnson Matthey, Leksi,* and the Appellate Division decision in *Gilbert Spruance*—all of which the Supreme Court "substantially" followed—it is clear that Illinois has the dominant interest with regard to the Granite City site and Oregon to the Portland site. The *Johnson Matthey* court, for instance, referred to New Jersey's *"paramount* interest in the remediation of toxic waste sites [in New Jersey], and in the fair compensation of victims of pollution." *Johnson Matthey,* 250 N.J.Super. at 57, 593 A.2d 367 (emphasis added). In addition, as discussed above, even though in *Johnson Matthey* Pennsylvania appeared to have a large number of contacts to the parties and to the insurance contracts, the court still found Pennsylvania's interests "relatively remote." *Id.*

In *Leksi,* the court found that New Jersey had a "compelling interest" in the remediation of New Jersey waste sites and that "it is difficult to imagine any interest that New Jersey could have that would be more compelling or, in the language of *State Farm,* more 'dominant and significant,' than its interest in determining the availability of funds for the cleanup of hazardous substances located within its boundaries." *Leksi,* 736 F.Supp. at 1335. In making this determination, the court cited several New Jersey statutes dealing with cleanup of toxic wastes, and emphasized the state's "statutory policy" in this regard. *Id.* The court also cited an *en banc* Eighth Circuit opinion stating that "the broad issue of the availability of liability insurance coverage under standard-form CGL policies for the costs of cleaning up hazardous waste sites is a question of substantial importance not only to liability insurers and their insureds, but to the public as well." *Id.* (*citing Continental Ins. Cos. v. Northeastern Pharmaceutical & Chemical Co.,* 842 F.2d 977, 985 (8th Cir.) (*en banc*), *cert. denied sub. nom., Missouri v. Continental Ins. Cos.,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988)).

In this case, NL has even fewer contacts to New York than did the *Johnson Matthey* insured to Pennsylvania. In *Johnson Matthey,* the parties and almost all of the relevant transactions were tied to Pennsylvania; the only real connection with New Jersey was the fact that the waste had been deposited there. In addition, it is difficult to see

how New Jersey could have a "paramount interest" in waste sites in New Jersey and Illinois or Oregon not have such an identical interest over waste sites in those respective states.[8] Indeed, in a similar case in Illinois, the District Court there found that Illinois had the strongest interest in determining insurance coverage because the site of cleanup, the plant that allegedly generated the waste, and the regulatory agency instrumental in investigating the site were all located in Illinois. *See Verlan, Ltd. v. John L. Armitage & Co.*, 1989 WL 8590 (N.D.Ill.1989). However, in a recent case, the Third Circuit showed how a state such as Illinois or Oregon might not have the most significant interest in having its law apply to determine coverage of waste sites within its borders. This decision, *General Ceramics*, is of course controlling authority. .

In *General Ceramics*, waste generated in New Jersey was disposed of in Pennsylvania (conversely, *Gilbert Spruance* dealt with waste generated in Pennsylvania that was disposed of in New Jersey), and the conflict-of-law issue involved how to interpret the standard "sudden and accidental" pollution-exclusion language. New Jersey, on regulatory estoppel and public policy grounds, interprets "sudden" as lacking any temporal element, while Pennsylvania considers "sudden" to mean abrupt. The Third Circuit, Judge Stapleton writing, applied New Jersey law. That court noted that New Jersey's interest in *Gilbert Spruance* was "in securing financial resources both to remediate New Jersey toxic-waste sites and to compensate victims of New Jersey pollution." *General Ceramics*, 66 F.3d at 657. In contrast, it pointed out that New Jersey's interest in *General Ceramics* was in protecting New

Jersey insureds and New Jersey insurance contract negotiation as well as promoting honesty before the state's regulatory agencies. Pennsylvania's interest, though, was different. By adopting a rule giving literal meaning to "sudden," the court stated, Pennsylvania intended "to protect the contracting parties by giving them the freedom to bargain for and agree on the allocation of risk in the manner they think is best. *Id.* The fact that the waste "ultimately ended up in Pennsylvania" was no matter because "Pennsylvania's policy of giving effect to the plain meaning of an unambiguous contract shows that it is not concerned with how the risk will be allocated, leaving that decision to the contracting parties." *Id.* at 657–58 (footnote omitted). Because none of the contracting parties was a Pennsylvania domiciliary, the court determined that only New Jersey's interest was implicated.

▪ In this case, this Court has determined that the principal location of the insured risk is in the state in which that risk is located—respectively, Illinois and Oregon. Under § 193, this is "the most important contact to be considered in the choice of applicable law...." Restatement, § 193, comment b, at 612. Given this, in determining the various states' interests, this Court must give much more weight to the states in which the sites are located than did the court in *General Ceramics*, which found that the waste in question was "to some degree transient," and thus the location of the risk was "less significan[t]." *General Ceramics*, 66 F.3d at 655; Restatement, § 193, comment b, at 611. As the Third Circuit noted in *NL Industries*, "*Gilbert Spruance* ... establishes that in environmental cases, the loca-

8. Although the Court is skeptical that the Illinois and Oregon legislatures are any less interested in cleaning up wastes in their respective states than the New Jersey legislature (or, for that matter, protecting the health, safety, or welfare of their respective peoples from such wastes), it will briefly note in passing that both Illinois and Oregon—like New Jersey—have passed numerous statutes regulating pollution. See, e.g., the Pollution Abatement Enforcement Act, Ill.Ann.St. Ch. 15, § 215/0.01 *et seq.;* the Hazardous and Solid Waste Recycling and Treatment Act, Ill. Ann.St. Ch. 30 § 750/3–1 *et seq.;* the Solid Waste Disposal District Act, Ill.Ann.St. Ch. 70 § 3105/1 *et seq.;* Local Solid Waste Disposal Act, Ill.Ann. St. Ch. 415, § 10/1 *et seq.;* Illinois Solid Waste Management Act, Ill.Ann.St. Ch. 415, § 20/1 *et seq.;* Toxic Pollution Prevention Act, Ill.Ann.St. Ch. 415, § 85/1 *et seq.;* Or.St.Ann. § 459.005 *et seq.* (solid waste management); Or.St.Ann. § 465.003 *et seq.* (reduction of use of toxic substances and hazardous waste generation); Or.St. Ann. § 466.005 *et seq.* (storage, treatment and disposal of hazardous waste and PCB); Or.St. Ann. § 468.076 *et seq.* (Uniform Transboundary Pollution Reciprocal Access Act); Or.St.Ann. § 468B.005 *et seq.* (water pollution control).

tion of the site carries *very substantial weight* in the 'significant relationship' analysis...." *NL Industries*, 65 F.3d at 321 (emphasis added). Or as Justice O'Hern has stated, *"Gilbert Spruance* ... emphasiz[es] that coverage issues are generally to be resolved on the basis of the location of the insured risk." *Waste Mgt., Inc. v. Admiral Ins. Co.*, 138 N.J. 106, 133, 649 A.2d 379 (N.J.1994) (O'Hern, J., concurring).

This case is also considerably more complex than *General Ceramics*. It involves more conflict-of-law issues, more .states in which the sites are located, and more potentially applicable state laws. In *General Ceramics*, the Court only. needed to decide whether to apply New Jersey or Pennsylvania law with regard to the "sudden" issue at sites in Pennsylvania—that is, it faced two options. In this lawsuit, the Court faces 12 options: two conflict-of-law issues (interpretation of "sudden" and late notice), two states with sites (Illinois and Oregon), and three states with a possible interest in seeing their law applied with regard to any one site (New Jersey, New York, and Illinois or Oregon).[9]

First the Court will deal with each state's interests with regard to the "sudden" issue and the Granite City site. Illinois interprets "sudden" as lacking a temporal element, and thus is obviously concerned about the allocation of risk under insurance contracts. In addition, the waste at Granite City was both generated and disposed in Illinois, Illinois has a strong statutory policy of regulating toxic wastes, and three of the insurers are Illinois citizens. In comparison, New Jersey has an interest in protecting the insured—a citizen of New Jersey—and in applying the rationale in *Morton*. In contrast, New York's interest here is fairly attenuated.

New York gives "sudden" its literal meaning, and it has failed to "enact laws to allocate risk to further its interest in securing financial resources both to remediate the toxic-waste site and to compensate the victims of the pollution."[10] *See General Ceramics*, 66 F.3d at 657. Thus, at best, New York might have a weak interest in protecting the one insurer which is a citizen of that state as well as an interest as the place where contracts were negotiated and executed.[11] Weighing these interests, the Court finds that, under *Gilbert Spruance*, Illinois has the greatest interest with regard to the "sudden" issue involving the Granite City site.

The Portland site, though, presents a different matter. Like Pennsylvania in *Gilbert Spruance*, Oregon has been "unconcerned" about the allocation of risk under the pollution-exclusion clause by interpreting "sudden" *non-temporally and failing to enact laws* that would have the same effect. Finally, none of the parties in this matter is a citizen of Oregon. At the same .time, though, because the waste at the Portland site is not "transient," in the sense of being foreseeably transported between states, the fact that the waste is located in Oregon has some weight. *See NL Industries*, 65 F.3d at 321 n. 5, 323 (noting that "the *Gilbert Spruance* court incorporated the interests of the waste site into the customary § 6 analysis" and that the court adopted a "site-specific analysis"). However, in light of *General Ceramics*, the failure of Oregon and New York to allocate the risk on the "sudden" issue is fatal; their interest in seeing their law apply here is relatively slight. Hence, the Court determines that New Jersey has the most significant interest here.[12]

9. No party has suggested applying Oregon law to the Granite City site or Illinois law to the Portland site.

10. That the New York Court of Appeals (or, for that matter, the Oregon Supreme Court) has yet to weigh in on this question does not matter. At the time *General Ceramics* was decided, the highest Pennsylvania court to deal with the interpretation of "sudden" in a standard pollution-exclusion clause was an intermediate appellate court.

11. True, NL was also a citizen of New York at the time the contracts were formed. However,

given the policies underlying the state's refusal to allocate the risk on the "sudden" and late-notice issues, New York cannot be said to have an interest in *protecting* New York insureds such as NL.

12. In theory, the EIL insurers might contend that the *Morton* rationale should not pertain to them here because they did not issue policies to NL with standard CGL pollution-exclusion clauses. This might suggest that New Jersey has a lesser interest in applying its law to the EIL contracts. However, none of the EIL insurers

With regard to the late-notice issue and the Portland site, though, the Court arrives at another conclusion. Neither Oregon nor New Jersey has left the allocation of risk on this question to the contracting parties. Oregon permits an insurer to maintain a late-notice defense only if it can show prejudice. Similarly, New Jersey requires an insurer to demonstrate a "likelihood of appreciable prejudice." However, New York permits an insurer to prevail on a late-notice defense even if it does not show prejudice. In other words, New York permits the parties to allocate the risk themselves on this issue. Under *General Ceramics*, then, Oregon and New Jersey have a greater interest on the late-notice question than New York. Hence, the Court need only weigh Oregon and New Jersey's interest against each other here, because just these two states have explicitly allocated the risk. In this regard, the Court must give heavy emphasis to the location of the insured risk, as required by *Gilbert Spruance*. In addition, it must recognize the numerous statutes Oregon has passed regulating toxic wastes because these statutes indicate Oregon's concern over remediating wastes within its borders. Weighing these Oregon interests against the New Jersey interests described above, the Court determines that Oregon's concerns are preeminent.

Finally, the Court turns back to the Granite City site and the late-notice issue there. Here, Illinois' law is the same as New York's. Neither allocates the risk on this issue. Hence, under *General Ceramics*, New Jersey has the greatest interest.

In sum, then, the Court finds as follows: 1) with regard to the "sudden" issue, Illinois law applies to the Granite City site and New Jersey law applies to the Portland site, and 2) with regard to the late-notice issue, New Jersey law applies to the Granite City site and Oregon law applies to the Portland site.

The parties argue for and against such a result. The insurers would prefer the Court to apply New York law across the board and NL wishes for New Jersey law across the board. While these arguments have the value of simplicity, they are ultimately without merit. The insurers largely avoid recognizing New Jersey case law, downplay the importance of § 193, incorrectly invoke the § 188 factors, and erroneously rely on the Third Circuit's choice-of-law analysis for tort claims in *NL Industries*. They also exaggerate the contacts with New York, and minimize those with New Jersey and Illinois and Oregon. Two of the insurers' arguments, though, warrant brief discussion.

█ The insurers argue that from around 1971 to 1982, a New York statute "mandated" the standard pollution-exclusion clause. This, they imply, indicates that New York allocated the risk under the insurance contracts in question and thus has a strong interest here. The statute in question required that liability insurance policies issued to industrial enterprises expressly exclude liability arising out of pollution or contamination discharges other than through sudden or accidental circumstances. This statute was intended to "help to assure that corporate polluters bear the full burden of their own actions spoiling the environment, and would preclude any insurance company from under-

---

face claims with regard to the Portland site, so the Court need not address such an argument.

Allstate, though, the successor-in-interest to Northbrook, does offer a similar contention. It claims that since Northbrook was not formed until after 1970, the *Morton* rationale should not apply to its contract with NL. Accordingly, Allstate implies that New Jersey has a lesser interest in applying its law to this contract.

The problem with this contention, though, is that, regardless of its merits, it is irrelevant to the Court's choice-of-law analysis. Northbrook entered into a CGL contract with NL just like all the other non-EIL insurers. If *Morton* actually does not apply to Northbrook, then New Jersey,

Oregon, and New York would all interpret the pollution-exclusion clause in the contract literally. Hence, there would be no actual conflict of law on this issue, and it would not matter what law the Court applied—the result would be the same. *See Lucker Mfg.*, 23 F.3d at 813. Conversely, if *Morton* actually does apply to Northbrook, then obviously it must be treated just like all the other defendant CGL insurers.

Accordingly, with regard to the "sudden" issue and the Portland site, the Court considers New Jersey's interest over *all* the insurance contracts, including Northbrook's, to be dominant. The question of *how* New Jersey law should apply to Northbrook—that is, whether the *Morton* rationale pertains to it—must await another day.

mining public policy by offering this type of insurance protection." McKinney's 1971 Session Laws of New York, at 2486. There are a number of problems with this argument.

First, the Court is faced with the question of which state has the strongest interest in having seeing its law govern the interpretation of "sudden." Since that interpretation will only occur in the future, it is not particularly helpful to look backwards to how such contracts *used* to be interpreted. For instance, if a state formerly interpreted "sudden" to be gradual and then changed its interpretation to abrupt, the Court should only look to the second—and controlling—interpretation to determine the state's interest. The former interpretation is largely irrelevant. Indeed, the circumstance that the state has actually *changed* its interpretation indicates that its interest in the new interpretation is particularly strong. Second, even if this Court were to credit a New York interest, it would be less than that of New Jersey or Illinois. This is because New York, unlike these other states, did not effectively "rewrite" any parties' contracts. Rather, for a decade or so, it merely foreclosed parties from entering into certain kinds of insurance contracts. In short, New York's temporary *ex ante* restrictions are much less intrusive on freedom of contract than New Jersey and Illinois' *ex post* interpretations of the contracts. Therefore, here New York's interest must be less than that of New Jersey and Illinois.

■ The insurers also contend that New Jersey's interest in seeing the *Morton* rationale apply is not implicated in this case because the contracts were not entered in New Jersey. As support, they point to *General Ceramics*, which applied the *Morton* rationale (and New Jersey law) to a situation where the sites were in Pennsylvania and the contracts had been entered in New Jersey. But *General Ceramics* nowhere adopts the *rule* that the *Morton* rationale would only apply if the contracts were entered in New Jersey. Moreover, such a rule would clearly be inappropriately applied. In *Gilbert Spruance*, the New Jersey Supreme Court relied on the *Morton* rationale (and applied New Jersey law) even though the contracts in that case had been negotiated and entered in Pennsylvania and both the insured and insurer were from Pennsylvania. Moreover, it is difficult to see why the *Morton* rationale and the location of contracting must be inextricably linked. New Jersey's interest in ensuring that the insurance industry acts honestly before its insurance regulatory agencies is separate from where insurance companies enter into specific policies.

Conversely, NL argues that New Jersey has a "dominant policy interest" in having its law apply here. It argues that New Jersey has an interest in seeing the *Morton* rationale applied in this litigation. This Court agrees in part, and, following *General Ceramics*, has taken this interest into account. However, this Court does not believe that New Jersey's interest, as expressed by the *Morton* rationale, trumps Illinois and Oregon's interests as the locations of the insured risks. Under the applicable case law, the latter states' interests are greater.

NL also asserts that New Jersey has a policy interest in "obtaining a fair contribution from insurers." NL Br., at 13. While this may be true, Illinois and Oregon, where they have expressly allocated the risk under the contracts, have a similar policy interest. The interest of these states in such a context is equally weighty to that of New Jersey.

### b. *Interests of commerce*

■ Assuming interstate or foreign commerce is involved, the next factor is furthering harmonious relations between the states. Any interest here, though, is weak because there is no evidence that wastes were transported across state lines either to or from Illinois or Oregon. In contrast, cases such as *Gilbert Spruance, General Ceramics, Leksi,* and *J. Josephson* all involved such interstate transportation. However, since there is doubtless some impact on interstate commerce here, the Court will briefly examine this factor.

The *General Ceramics* court notes that if the choice of a particular state's law disrupts another state's regulatory efforts, this could have an adverse effect on interstate commerce. Along these lines, comment d of § 6 suggests that, in formulating a choice-of-law

rule, a court should look to see what needs and policies other states have adopted or would be likely to adopt. This suggests that, at least in the instant case, the result of the analysis under the interest-of-commerce factor would be identical to that under the state-interest one. New Jersey would have a greater impacting interest than Oregon and New York have on the "sudden" issue regarding the Oregon site and than Illinois and New York on the late-notice issue regarding the Illinois site. In turn, Illinois would have the greater interest than New Jersey and New York have on the "sudden" issue regarding the Illinois site and Oregon would have a more significant interest on the late-notice issue regarding the Portland site.

Another factor to look at is whether applying a particular state's law would increase or decrease the risk of further contamination to Illinois or Oregon. *See J. Josephson,* 265 N.J.Super. at 244, 626 A.2d 81. An examination of this question leads to the same outcome as above.

The insurers argue that New York has the greatest interest here because "the general rule is that contractual rights are determined by the law of the place of contracting" and the needs of the interstate system would be frustrated if contracting parties could not rely on this rule. See, e.g., CU Br., at 14. This argument is irrelevant. It ignores the *specific* rule outlined in the Restatement for insurance contracts. This rule clearly states that the parties' rights in a case like this are ·normally determined by the law of the location of the insured risk.

### c. *Interests of the parties*

The next factors are the protection of the parties' justified expectations and their need for certainty, predictability, and uniformity of result. Here, this Court needs to look at whether the parties have justifiably molded their conduct to conform to the law of another state. Also, the Court should emphasize the need for predictability where the parties thought in advance about the legal consequences of their transactions and the need for uniformity where "the transfer of an aggregate of moveables, situated in two or more states, is involved." Restatement, § 6, comment i, at 16.

Here, most of the events involved in the formation of the contract occurred in New York, and, during the negotiation and term of the contracts, the bulk of NL's operations and employees could be found in New Jersey. At the same time, the contracts insured risks located in some 28 states, including Illinois and Oregon. In these latter two states, at least at the Granite City site and Portland sites, the wastes appear to be relatively fixed in place. In short, this case is very different from *Gilbert Spruance, General Ceramics, Leksi,* and *J. Josephson.* Not only did those cases involve "mobile" waste, but they all involved sites in either New Jersey and Pennsylvania only (the first three cases), or New Jersey, Pennsylvania, and New York (the last case). In other words, these cases involved only two or three states, all of which neighbor each other and through which it would be foreseeable that waste would be transported.

Conversely, in this case, NL's insured operations were practically nationwide and involved states as geographically disparate as California, Louisiana, and Rhode Island. Given this, it is surprising that the parties did not include a choice-of-law provision in the insurance contracts. That the parties did not, then, implies that they did not greatly value predictability of interpretation. Moreover, that the insured risks at issue were not foreseeably transported across state borders also suggests that the Court should discount the need for uniformity of interpretation. In the absence of any evidence that the parties *actually* expected New York or New Jersey law to apply across the board, the most reasonable conclusion here would be that the parties' intended that the law of the state where a particular site was located would govern the interpretation of the contracts covering that site.

The insurers disagree. They claim that, at the time the parties entered into the contracts, New York law "required" the standard pollution-exclusion clause (this statute was apparently in effect from 1971 to 1982). This, they claim, implies that the parties must have expected New York law to apply. As support, CU provides a letter dated April 5, 1974, from CU to NL's insurance broker in

New York. The letter, headed "N L IN-DUSTRIES," cites the relevant statute and states that CU has been "advised ... that it is not permissible in this State [i.e., New York] to insure pollution claims unless due to sudden or accidental causes." The letter, though, goes on to admit that

> [w]e were not able to check obviously with each and every Insurance Department *throughout the country*, however, we do believe that this type of law may also exist in *other States.* It is also possible that the spiritof [sic] this law may exist on a common law basis as being against public policy in *other jurisdictions. You may wish to verify some of these points yourself. In any event, I believe this is the information you were looking for.*

4/5/74 Letter (emphasis added). Ironically, then, the letter actually undercuts CU's argument. It strongly suggests that CU and NL (through NL's broker) expected that the law of states other than New York would apply to the NL–CU contracts.[13] The letter's language is most consistent with the notion that the law of the state where the insured risk is located should govern the interpretation of the contracts that cover that risk.

Therefore, this Court finds that, if anything, the scanty evidence available suggests that the parties justifiably expected Illinois law to apply to the Illinois site and Oregon law to the Oregon site. Moreover, such a result, while possibly complex, would also be certain, predictable, and, within each state at least, uniform.

d. *Interests underlying the area of law*

██ This factor is not particularly important unless the policies of the interested states are significantly different. Restatement, § 6, comment h, at 15. Here, the relevant areas of law would be insurance and environmental law. *Cf. NL Industries*, 65

F.3d at 321 (noting that a "different analysis" governs environmental insurance contract controversies and product liability insurance contract disputes, and that, with regard to the latter, the applicable areas of law for this factor are insurance and tort law).

With regard to the "sudden" issue and the Illinois site, only New Jersey and Illinois have any significant interests. Given the minor differences between New Jersey and Illinois' interpretation of the "sudden" issue, the policies governing their respective laws on environmental insurance contract law loom large. Here, then, the Court must look to Illinois' strong statutory policy on remediating wastes within its borders. This policy obviously has an impact on how the parties' allocated risk for the environmental claims at issue. Thus, because New Jersey's interest in remediating wastes in Illinois is more limited than Illinois' interest in doing so, Illinois' interest under this factor is obviously weightier. *See J. Josephson*, 265 N.J.Super. at 244, 626 A.2d 81.

Similarly, with regard to the late-notice issue and the Portland site, Oregon's interest must be greater than that of New Jersey and New York's.

As far as the late-notice issue and the Illinois site and the "sudden" issue and the Oregon site, though, the analysis is different. Here, this Court recognizes that New Jersey's policies are quite different from those of the other states. While Illinois, Oregon, and New York give effect to the plain meaning of the insurance contract, New Jersey aims to protects its insureds and promote honesty before its regulatory agencies. Therefore, the Court should apply New Jersey law here.

In response, the insurers argue that the underlying field of law here is really CERCLA law. Since CERCLA is a federal statute, they claim that Illinois and Oregon law are

---

**13.** Along these lines, the following revealing exchange occurred at oral argument between the Court and counsel for NL:

THE COURT: ... *Why didn't they build it into the agreement? Why didn't they say New Jersey law will apply?*

MR. FERGUSON: *I think N.L. was insuring risks all over the place.*

THE COURT: You asked me to apply New Jersey law all over the place, why didn't you build it into the extra—

MR. FERGUSON: I guess my answer to that is I wish they had. I don't have an explanation. T75–76: 6–14 (emphasis added).

not really implicated here. However, there are several difficulties with this argument. First, the Court is resolving a conflict of law on this motion. If the underlying field of law were really federal, then there would only be a false conflict here and nothing for the Court to decide. Second, the disputed issues in this case involve the interpretation of an insurance contract. This is a state-law issue, one on which states have particular policies. Third, the Court's choice of law here will have some effect on whether or how fast the sites in question are remediated. Thus, its decision implicates respective states' environmental policies.

e. *Interests of judicial administration*

The Restatement notes that while "[i]deally, choice-of-law rules should be simple and easy to apply[, t]his policy should not be overemphasized, since it is obviously of greater importance that choice-of-law rules lead to desirable results." Restatement, § 6, comment j, at 16. While the rule employed in deciding this motion is somewhat complex, it is not difficult to apply. Moreover, it is required by the case law. In fact, as the New Jersey Supreme Court suggested in *Gilbert Spruance*, "short of congressional intervention or a limited overruling of the *Erie* doctrine to permit the development of a federal common law of contracts intended to be nationwide in scope," some complexity in this area is necessary and inevitable; the goal of uniformity of insurance contract interpretation in the environmental area is an "illusion." *Gilbert Spruance*, 134 N.J. at 114, 629 A.2d 885 (*quoting Travelers Indemnity Co.*, 718 F.Supp. at 1258)).

4. *Whether the Court should make a choice-of-law decision for all the environmental claims*

■ NL requests that the Court decide what state's law should apply to all the claims in this litigation, not just those arising from the Granite City and Portland sites. NL avers that the parties cannot reasonably evaluate the likely risks and outcomes of the case unless the Court determines choice-of-law across the board.

While NL's application makes some sense, the Court declines to grant it. First, the New Jersey Supreme Court has made clear

that it favors a government-interest sensitive approach over a predictable one. For the Court to resolve which state's law should apply to each of the remaining 91 or so sites, it would need to balance the interests of the state in which the site is located with that of New Jersey and New York. This is an issue that should be properly briefed by the parties. Second, given the reasoning of this opinion, the parties can apply the Court's analysis to the remaining sites themselves, and thus have a fairly good idea about what law the Court would apply. The parties, if they wish, can then use these determinations to choose whether to resolve certain claims or proceed further in litigation on them. Third, deciding choice of law for all the sites would defeat the intent behind the primary case-management technique the Court has already employed, namely requiring the parties to litigate first a small number of representative sites. It is in the parties and the Court's interest to limit the Court's decisions to the representative sites *the parties themselves selected;* this not only makes discovery and motion practice manageable, but also adheres to the parties' expectations when they designated the representative sites.

III. *Conclusion*

For the foregoing reasons, the Court **grants** all the parties' motions for partial summary judgment on choice of law **in part.** With regard to the issue of how to interpret the pollution-exclusion clause in the CGL contracts, it determines that Illinois law applies to the Granite City site and New Jersey law applies to the Portland site. Moreover, with regard to the late-notice issue at the two sites, it rules that New Jersey law applies to the Granite City site and Oregon law applies to the Portland site.

**SO ORDERED.**